# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-1469

GERALD GEORGE, et al.,

*Plaintiffs-Appellant*s,

*v.*

KRAFT FOODS GLOBAL, INCORPORATED, et al.,

*Defendants-Appellee*s.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 01713—**Sidney I. Schenkier**, *Magistrate Judge*.

ARGUED OCTOBER 19, 2010—DECIDED APRIL 11, 2011

Before CUDAHY and ROVNER, *Circuit Judges*, and ADELMAN, *District Judge*.[*]

ADELMAN, *District Judge*. Plaintiffs, current and former employee-participants in the Section 401(k) plan (the "Plan") of Kraft Foods Global, Inc. ("Kraft") brought this

---

[*] Hon. Lynn S. Adelman, of the Eastern District of Wisconsin, sitting by designation.

class action against various individuals and entities associated with the Plan, alleging that they breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") by imprudently allowing the Plan to incur excessive expenses and generate insufficient returns.[1] The district court certified a plaintiff class composed of Plan participants but ultimately granted summary judgment to defendants.[2] Plaintiffs appeal this grant of summary judgment along with two of the district court's procedural rulings—its order denying plaintiffs' motion for leave to file an amended complaint and its order excluding the testimony of one of plaintiffs' expert witnesses, Dr. Edward O'Neal. We affirm the procedural rulings and affirm in part and reverse in part the grant of summary judgment.

## I. Background

The Kraft Plan was a defined contribution plan within the meaning of ERISA, *see* 29 U.S.C. § 1002(34), and was structured as a typical Section 401(k) plan. The Plan established an account for each participant, and partici-

---

[1] Plaintiffs named Kraft and various committees and individuals associated with the operation and administration of the Plan as defendants. Because none of the parties' arguments turns on the identity of the various defendants, we will refer to them collectively as "defendants" or "Plan fiduciaries."

[2] The decision to certify a plaintiff class has not been appealed, so we do not comment on whether class certification was appropriate.

pants were allowed to contribute up to a specified amount of their wages to that account. To an extent, Kraft made matching contributions on behalf of its employees. Upon retirement, a participant had whatever the account had accumulated through contributions and investment earnings.

Between 2000 and 2006, the Plan had between 37,000 and 55,000 participants and between $2.7 billion and $5.4 billion in assets. Participants were able to direct their contributions into one or more mutual funds, and during the relevant time the Plan allowed participants to choose from a menu of seven to nine different funds. Two of these funds were company stock funds ("CSFs"), which invested almost exclusively in the common stock of Kraft and Kraft's then-parent company, Altria Group, Inc. (formerly Philip Morris).[3] The Plan also offered various multi-stock funds, two of which are relevant to this case, the Growth Equity Fund and the Balanced Fund.

In connection with their administration of the Plan, the Plan fiduciaries hired various service providers, including a recordkeeper, Hewitt Associates ("Hewitt"), and a trustee, State Street Bank & Trust Company ("State Street"). Hewitt's job was to keep track of the various accounts and transactions associated with the Plan and to assist Plan participants in managing their accounts. State Street's job was to hold and manage the Plan's assets. The fees of both Hewitt and State Street were paid out of Plan assets.

---

[3] By 2007, Kraft was no longer a subsidiary of Altria.

Plaintiffs filed the present action in 2006, alleging that Plan fiduciaries mismanaged the CSFs and paid excessive fees to Hewitt and State Street. Plaintiffs' claims arise under 29 U.S.C. § 1104(a)(1), which provides that plan fiduciaries must act prudently—i.e., "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." This section also states that plan administrative costs must be "reasonable." We explain the details of plaintiffs' claims in the course of our analysis of each claim, below.

## II.  Motion to Amend Complaint

We start by examining whether the district court abused its discretion in denying plaintiffs' motion for leave to file an amended complaint under Federal Rule of Civil Procedure 15(a). *See Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008). Plaintiffs' original complaint, which named seven different defendants, focused on the alleged mismanagement of the CSFs and the alleged payment of excessive fees to Plan service providers. The proposed amended complaint sought to add an additional twenty-one defendants and to add claims regarding various investment decisions made by Plan fiduciaries. As the district court characterized the proposed new claims, they involved attacks "on the substantive investment choices made with the assets of the Plan. Questions of whether there were appropriate investment vehicles used, whether there should have

been holdings in investment X versus investment Y. Whether there should have been cash position A or cash position B." (App. 17.) The district court contrasted these claims with the claims in the original complaint, which focused largely on "the issue of fees and expenses paid to service providers." (App. 16.)

Ultimately, the district court denied plaintiffs' motion on the ground of undue delay. *See, e.g., Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008) (recognizing that district courts have broad discretion to deny leave to amend where there has been undue delay). We therefore take some time to explain the procedural history of the case up to the time of the district court's ruling.

Plaintiffs filed this lawsuit on October 16, 2006, in the Southern District of Illinois. Defendants then moved to transfer venue to the Northern District of Illinois, and the Southern District allowed plaintiffs to conduct discovery in connection with the venue motion. Through this initial discovery, plaintiffs obtained much of the evidence underlying the allegations they sought to add to the case by way of their unsuccessful motion to amend.

The Southern District of Illinois granted defendants' motion to transfer venue, and the case was transferred to the Northern District of Illinois on March 26, 2007. Shortly thereafter, the district court ordered the parties to meet and confer pursuant to Federal Rule of Civil Procedure 26(f) and arrive at a proposed discovery schedule. In their proposal, the parties did not request a deadline for joining parties or amending pleadings. After receiving the parties' proposal, the court entered

a scheduling order and, pursuant to the parties' request, bifurcated fact discovery from discovery relating to class certification. The scheduling order set August 6, 2007, as the deadline for completing class-certification discovery. The district also set a deadline for plaintiffs to file their class-certification motion; briefing on this motion was to be completed by January 25, 2008. After entering this schedule, the court ordered the parties to conduct a second Rule 26(f) discovery conference regarding fact (i.e., non-class certification) discovery. The parties did so, and once again they failed to request a deadline for adding parties or amending pleadings without leave of court. Upon receipt of the parties' new proposed discovery plan, the district court set a deadline of March 21, 2008 for non-expert discovery and a deadline of June 16, 2008 for expert discovery.

On November 12, 2007, plaintiffs filed their class-certification motion, and briefing on this motion was complete by January 25, 2008. On January 31, 2008, plaintiffs moved for an extension of time to complete discovery on the basis of the overwhelming number of documents produced by defendants in response to plaintiffs' requests for production. The district court granted this request and set deadlines for non-expert and expert discovery of May 20, 2008 and August 15, 2008, respectively. On March 21, 2008, plaintiffs moved to compel discovery from defendants. Plaintiffs wanted to obtain unredacted copies of certain documents, but defendants refused to remove their redactions. The district court granted this motion and ordered defendants to produce the unredacted documents by April 4, 2008. On April 17,

2008, at plaintiffs' request, the district court extended the deadlines for non-expert and expert discovery until July 21, 2008 and October 17, 2008, respectively. On May 7, 2008, plaintiffs filed their motion for leave to file an amended complaint.

In denying plaintiffs' motion, the district court found that plaintiffs knew about the facts that gave rise to their proposed amendments "at the outset of the case, either before the original complaint was filed in October of 2006, or shortly thereafter." (App. 6.) Plaintiffs did not include any argument in their opening brief on appeal indicating that they dispute this finding. In their reply brief, plaintiffs suggest that they were unable to "clearly ascertain all of the fiduciaries and elements of their breaches" until the district court granted plaintiffs' motion to compel production of the unredacted documents. (Reply Br. at 5.) However, arguments raised for the first time in a reply brief are forfeited. *See, e.g., United States v. Lupton*, 620 F.3d 790, 807 (7th Cir. 2010). In any event, plaintiffs do not identify any specific claims or allegations that they could not have asserted prior to the time they received defendants' unredacted documents, and so we are in no position to disturb the district court's finding regarding what plaintiffs knew and when.

Plaintiffs also indicate that they decided to wait until after defendants finished their document production to seek leave to amend in order to avoid having to seek leave to amend more than once. That is, plaintiffs tell us that they delayed seeking leave to amend in connection with the claims they knew about since nearly the

beginning of the case so that they would not have seek leave a second time in the event that defendants' document production revealed even more claims. Plaintiffs argue that the district court unfairly expected them to seek leave to amend before defendants completed their production. However, we do not think the district court acted unfairly. If plaintiffs expected to bring new claims but also wanted to delay seeking leave to amend until they reviewed defendants' written discovery, plaintiffs could have requested a specific deadline for joining parties or amending pleadings. The district court could have then set the deadline for a time after plaintiffs received the necessary discovery. Even though plaintiffs submitted two different Rule 26(f) discovery plans to the district court, they never informed the district court that they contemplated amending their complaint or that they needed a deadline for joining parties or amending pleadings.[4] Accordingly, plaintiffs' desire to avoid seeking leave to amend more than once does not excuse their belated assertion of the claims they knew about since nearly the beginning of the case.

Plaintiffs point out that delay alone is not a reason to deny a proposed amendment, and that delay must be

---

[4] In their briefs, plaintiffs blame the district court for not including a deadline for joining parties or amending pleadings in its Rule 16 scheduling order, *see* Fed. R. Civ. P. 16(b)(3)(A), but we find that plaintiffs must share the blame, in that they never requested such a deadline and did not object to the court's scheduling order on the ground that it failed to include one.

coupled with some other reason, such as prejudice to the defendants. *See, e.g., Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1225 (7th Cir. 1988). The district court recognized this principle, however, and, in a detailed oral opinion, explained that plaintiffs' delay caused prejudice to both the defendants and the court. The court emphasized that the parties and the court had already invested substantial resources in the class-certification stage of the case, and that a motion for class certification was fully briefed and on the verge of being decided. The court reasonably determined that adding twenty-one new defendants and several new substantive claims to the case would have substantially disrupted the progress that had been made regarding class certification. Further, the court noted that discovery was scheduled to be completed in the next few months, and that the conclusion of discovery had already been postponed a number of times. The court found that adding the new claims and defendants at that juncture would have "completely thwart[ed]" the discovery schedule, and that allowing the amendment would have added a year or more to the duration of the case. (App. 16-18.)

The district court did not err in considering the impact of the proposed amendments on the progress of the case, *see Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 811 n.14 (7th Cir. 1999); *Perrian v. O'Grady*, 958 F.2d 192, 195 (7th Cir. 1992); *Campbell v. Ingersoll Milling Mach. Co.*, 893 F.2d 925, 927 (7th Cir. 1990), and we cannot say that the court abused its discretion in concluding that this impact was severe enough to require denial of leave to

amend. Plaintiffs emphasize that, at the time of the denial, discovery had yet to close and no trial date had been set. But, as explained above, much else had occurred by that time, and the district court reasonably determined that allowing the amendment would have required the parties and the court to backtrack and redo work that had already been completed, including the work concerning class certification. Thus, although we might not have denied leave to amend had we been in the district court's position, the district court did not abuse its discretion in doing so.

### III.  Decision to Exclude Testimony from Dr. O'Neal

Plaintiffs next argue that the district court abused its discretion when it struck plaintiffs' designation of Dr. Edward O'Neal as an expert witness on relevance grounds. *See* Fed. R. Evid. 402; *see also United States v. Dooley*, 578 F.3d 582, 591 (7th Cir. 2009) (stating that a relevance determination is reviewed for abuse of discretion). Plaintiffs describe O'Neal as an expert on mutual funds and state that they sought to introduce his testimony in order to show that defendants paid excessive fees to the managers of the Growth Equity Fund and the Balanced Fund. Both of these funds were "actively managed," meaning that the manager of each fund attempted to beat the market through the selection of securities for inclusion in the fund. Active management can be contrasted with passive management—or indexing—in which fund managers simply replicate the performance of the market as measured by an index such as the

S&P 500. Because active managers monitor, research and trade the holdings of the fund, they charge more for their services than passive managers.

One of the claims that plaintiffs sought to raise through their amended complaint was that the defendants imprudently allowed participants to invest their contributions in actively managed funds. Plaintiffs argued, and Dr. O'Neal opined, that active management is of dubious value, and that therefore the Plan should have offered only passively managed index funds to Plan participants. Because the district court denied the motion to amend, however, this claim did not become part of the case. Nonetheless, plaintiff still designated O'Neal as an expert, arguing that his opinion was relevant to the issue of whether the Plan paid excessive fees to the managers of the Growth Equity Fund and the Balanced Fund. Plaintiffs' theory was that because active management generally does not produce higher returns than passive management, any fee charged by an active manager in excess of the fee charged by a comparable passive manager would be excessive. The district court refused to allow plaintiffs to pursue this theory, finding that plaintiffs were attempting to sneak their claim regarding the prudence of actively managed funds back into the case.

On appeal, plaintiffs do not dispute that O'Neal's opinion as to excessive fees depended on his opinion as to the imprudence of actively managed funds. Moreover, we have reviewed plaintiffs' original complaint and can find no allegations giving defendants fair notice that

plaintiffs would be pursuing a claim premised on the imprudence of actively managed funds. Thus, we conclude that the district court did not abuse its discretion in concluding that O'Neal's opinions were not relevant to any issue in the case.

## IV.  Grant of Defendants' Motion for Summary Judgment

We next examine whether the district court erred in granting defendants' motion for summary judgment on plaintiffs' breach of fiduciary duty claims. We review a district court's grant of summary judgment de novo, *Perez v. Illinois*, 488 F.3d 773, 776 (7th Cir. 2007), and will affirm only if there is no genuine issue of material fact and defendants are entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a). We take the evidence and all reasonable inferences therefrom in plaintiffs' favor. *Perez*, 488 F.3d at 776.

### A.  Defendants' Operation of CSFs

Plaintiffs first argue that defendants made imprudent decisions with respect to the company stock funds, or CSFs. The Plan offers two such funds to participants, one that invests in Kraft common stock and one that invests in Altria common stock. These funds are operated on a "unitized" basis, meaning that participants own units of the fund rather than shares of the relevant company stock. Although the CSFs invest almost exclusively in the common stock of the relevant companies, they

also contain a small amount (roughly 5% of the overall value of the fund) of cash and other similar highly liquid investments. The parties refer to the non-stock portions of the CSFs as the "cash buffers." The value of a CSF unit is determined by the value of the relevant company stock as well as the value of the fund's cash buffer.

The main benefit of unitization is that it allows participants to quickly sell their interests in the funds and either receive distributions or transfer their contributions to other Plan funds. When a participant initiates a sale of units, Plan administrators use cash from the cash buffer to make an immediate distribution to the participant or to immediately transfer the participant's investment in the CSF to another Plan fund. Without the cash buffer, the participant could not receive a distribution or reinvest the relevant funds until Plan administrators sold enough stock to fund the transaction—a process that normally takes three business days. Another benefit of unitization is that it allows the Plan to save transaction costs by "netting" participant transactions. Absent unitization, every time a participant initiated either a purchase or sale of stock, the Plan would have to enter the market and pay a brokerage commission and various fees on the associated transaction. With unitization, the Plan can offset a participant's request to purchase with another participant's request to sell, and the Plan will need to enter the market and pay transaction costs only to the extent necessary to meet a net inflow or outflow of investment in the relevant fund.

Plaintiffs argue that the unitized structure of the CSFs resulted in two problems—which the parties refer to as "investment drag" and "transactional drag." Investment drag is caused by the cash buffer. When the relevant company stock appreciates in value, the value of a unit of the associated CSF also appreciates. However, because investment in cash is less risky than investment in stock, the return on the cash component of the CSF will not be as high as the return on the stock component. Thus, having cash in the fund when the stock goes up results in lower returns than would have been experienced had the cash portion of the fund been used to buy more stock. This phenomenon is what the parties mean by investment drag. Note, however, that describing this phenomenon as "drag" is appropriate only if the value of the stock rises over the relevant period. If the value of the stock declines, a unit of the fund will not decline in value to the same extent as a share of stock, since the value of cash is relatively stable. Thus, in a market in which the relevant stock is declining, the presence of cash in the fund would be a good thing.[5]

Transactional drag involves the transaction costs incurred by the fund in connection with participant transactions—i.e., requests to buy and sell units of the fund.

---

[5] Defendants point to this fact as an additional benefit of the cash buffer—they contend that it acts as a hedge against a decline in value of company stock. However, nothing in the record indicates that the Plan fiduciaries viewed the cash buffer as anything other than an administrative device.

A request to buy into or sell out of a fund generally requires Plan administrators to buy or sell shares of Kraft or Altria stock, and the Plan thus has to pay the brokerage commissions, SEC fees, and other costs associated with the trade. As noted above, the unitized nature of the fund allows administrators to "net" requests to buy and sell against each other in order to minimize transaction costs. However, when transaction costs are incurred, they are deducted from the overall value of the fund rather than allocated to the specific participants who initiated the transactions. Each participant thus bears a pro rata share of the fund's total transaction costs regardless of the number of transactions he or she initiates. This means that frequent traders do not bear the full cost of their trades and that infrequent traders essentially subsidize frequent traders. Plaintiffs argue that this gives all participants an incentive to trade frequently, which in turn results in higher transaction costs for the fund. These higher transaction costs are what the parties mean by "transactional drag."

Plaintiffs argue that the investment and transactional drags associated with the unitized structure of the CSFs caused investment in the CSFs to underperform direct investment in Kraft and Altria common stock by $83.7 million between 2000 and 2007. Plaintiffs' expert, Ross Miller, arrives at this figure by estimating what the funds would have earned had they not been unitized—i.e., had participants owned shares of the relevant stock directly rather than indirectly through a fund.

At this point, we must pause to identify the precise contours of plaintiffs' claim. Plaintiffs' legal theory is

breach of fiduciary duty under ERISA—more specifically, breach of the prudent man standard of care outlined in ERISA section 404(a). 29 U.S.C. § 1104(a). To decide the issues presented by this appeal, however, we need to identify the act or omission (or series of acts or omissions) constituting the alleged breach of the prudent man standard of care. As to that, it is reasonably clear that we are dealing with omissions rather than overt acts: plaintiffs argue that defendants should have done something to minimize or eliminate investment drag and transactional drag. But what is it that plaintiffs think defendants should have done? Plaintiffs do not precisely answer this question. However, it is reasonably clear that plaintiffs think that defendants should have done one or more of the following: (1) eliminate unitization and the cash buffer and allow participants to own shares of Altria and Kraft stock directly (thereby eliminating both investment and transactional drag), and/or (2) impose measures designed to reduce the number of participant-initiated transactions (thereby reducing transactional drag). In connection with (2), plaintiffs suggest that defendants could have imposed a trading limit that would have limited the number or frequency of trades participants could make.

The next problem is identifying *when* plaintiffs think defendants should have taken the above measures. As noted, plaintiffs contend that the failure to eliminate unitization and the cash buffer caused the Plan to miss out on $83.7 million in investment gains between 2000 and 2007. However, nothing in the record indicates that at the beginning of this period—i.e., in the year 2000 or

earlier—defendants were in possession of information that would have caused a prudent man to realize that his inaction would cost the Plan $83.7 million or cause the Plan to incur other losses of similar magnitude. The district court, in granting summary judgment to the defendants, did not explicitly address the question of when defendants might have breached their fiduciary duties. However, the district court's decision was based on its determination that defendants had weighed the costs and benefits of implementing plaintiffs' proposed solutions and concluded that the costs of making any changes to the CSFs outweighed the benefits. (App. at 51-60.) The court then deferred to the fiduciaries' decision. This approach implies that the district court had set its sights on a relevant time period—i.e., a time when defendants weighed the costs and benefits and reached a decision. However, we are not directed to any place in the record that identifies when defendants made this decision.

Although we are not explicitly directed to a decision, it is reasonably clear that any decision would have been made between 2002 and 2004. During this time period, the Kraft plan fiduciaries and the fiduciaries of Altria's 401(k) plan engaged in discussions about transactional (and, to a lesser extent, investment) drag in the CSFs maintained by both the Kraft plan and the Altria plan. (Recall that during this time period, Altria was Kraft's parent company.) One fiduciary determined that, in 2001, the transactional drag on the Kraft plan's Altria CSF was $3.6 million, which resulted in an average cost of $145 per participant per year. The CSFs

in the Altria plan were experiencing even higher transaction costs, and fiduciaries of the Altria plan eventually informed the fiduciaries of the Kraft plan that they were taking measures to reduce these costs. By 2003, Altria had moved to a structure known as "real-time trading," which was essentially the opposite of unitization: under real-time trading, each participant owned shares of the relevant stock rather than units of a fund that invested in the stock. Around this same time, the Kraft plan's recordkeeper, Hewitt, informed Kraft plan fiduciaries that although Hewitt did not offer a real-time trading service, it could implement other solutions to transactional drag, including various trading restrictions. (The Altria plan used a different recordkeeper, Fidelity, and Fidelity offered a real-time trading service.) Hewitt also informed Kraft that it was willing to work with Kraft to develop a real-time trading solution if Kraft wanted to adopt one in response to transactional drag within the Kraft plan CSFs. The parties also cite various emails and other correspondence among Kraft plan fiduciaries and Hewitt regarding the costs and benefits of various solutions to investment and transactional drag. This correspondence continues into 2004 and seems to come to an end in about December of that year.

Despite all this discussion of investment and transactional drag, however, we can find nothing in the record indicating that defendants ever made a decision on these matters—i.e., that they actually determined whether the costs of making changes to the CSFs outweighed the benefits, or vice versa. We know that the status quo from 2004 persists to this day, but the record

does not tell us whether this persistence is the result of a deliberate decision to maintain the status quo or whether it was caused by the fiduciaries' decision to table the matter. Although the district court made various statements indicating that it thought that Plan fiduciaries had made a reasoned decision to maintain the status quo,[6] it did not cite a document or affidavit, or any deposition testimony, explaining what that decision was, and we have been unable to find anything. Moreover, on appeal, defendants' recitation of the facts contains no citation to any such decision. Instead, they offer the following in their statement of facts:

> In 2003, Altria changed the CSFs in its 401(k) plan to a non-unitized format using "Real Time Trading," which Fidelity offered to its recordkeeping clients, including Altria. When this happened, the responsible personnel considered making a similar change in the [Kraft] Plan. After extensive discussion regarding the costs and benefits of alternatives with the [Kraft] Plan's recordkeeper, Hewitt (which did not have a system similar to Real Time Trading), *the Plan's CSFs were maintained as unitized*.

---

[6] *See* App. 57 ("Ultimately, defendants determined that the advantages of maintaining the structure of the CSFs outweighed the benefits of changing to a real-time trading system."); App. 59 ("Here, the undisputed facts show that defendants used a reasoned decision-making process to determine the structure of the Plan's company stock funds and to maintain an adequate amount of cash to meet the demands of trading in the funds . . . .").

(Appellee's Br. at 11-12 (emphasis added).) The emphasized clause was obviously carefully worded to be consistent with both a deliberate decision to maintain the status quo as well as inertia. Thus, viewing the evidence in the light most favorable to plaintiffs, we must conclude that no Plan fiduciary ever made a decision regarding the solutions to investment and transactional drag that were proposed between 2002 and 2004.

In light of the above, we view plaintiffs as arguing that defendants breached their fiduciary duties by failing to reach a decision regarding the proposed solutions to investment and transactional drag by the end of 2004. That is, we view plaintiffs as arguing that prudent fiduciaries armed with the information that had been presented to the Kraft fiduciaries between 2002 and 2004 would have at least decided between, on one hand, maintaining the status quo and, on the other, making changes to the CSFs in an effort to limit or eliminate investment and transactional drag. Under ERISA, a fiduciary's failure to exercise his or her discretion—i.e., to balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so is a breach of the prudent man standard of care. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420-21 (4th Cir. 2007); *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733-34 (7th Cir. 2006).

As noted, the district court's grant of summary judgment rests on its finding that the undisputed facts established that defendants actually made a reasoned deci-

sion between the status quo and the various proposed solutions. Since we conclude that this finding is not supported by the record, we cannot affirm on the grounds given by the district court. Moreover, the district court's characterization of the fiduciaries' actions has clouded the presentation of the issues on appeal. Defendants devote most of their brief to arguing that we must defer to the Plan fiduciaries' decision; however, as noted, they fail to direct us to the decision entitled to deference. Although plaintiffs point out that defendants never made a reasoned decision, they also contend that even if they did there is a genuine issue of material fact as to whether that decision could be described as prudent. In this regard, plaintiffs argue that because Altria saw fit to switch to real-time trading, a reasonable trier of fact could conclude that it was imprudent for Kraft to fail to follow suit.[7]

Given the state of the record, we think the best course is to reverse the district court's grant of summary judgment on this claim and remand for further considera-

---

[7] Although we do not conclusively resolve whether Kraft's failure to follow Altria's lead could be deemed imprudent, we note that plaintiffs have not established that Altria was a prudent fiduciary. For all we know, Altria's decision to switch to real-time trading was imprudent. Plaintiffs might say that Altria's decision succeeded in eliminating investment and transactional drag, but this would be an impermissible attempt to prove imprudence by hindsight (or, as the case may be, prudence by hindsight). *See DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 465 (7th Cir. 1990).

tion. However, before leaving this issue, we will provide some additional analysis of plaintiffs' claim in order to guide the parties on remand. First, we repeat that the record reveals a genuine issue of material fact as to whether Plan fiduciaries made a decision with respect to the proposed solutions to investment and transactional drag.[8] Likewise, there is a genuine issue of material fact as to whether the circumstances prevailing in 2004 would have caused a prudent fiduciary to make a decision on these matters. If during further proceedings these issues are resolved in plaintiffs' favor, then plaintiffs will have established that defendants breached the prudent man standard of care. In contrast, if defendants establish that prudence did not require them to make a decision, then plaintiffs' claim for breach

---

[8] The dissent characterizes the decision of the fiduciaries as a choice between unitization and real-time trading. However, the decision we are talking about is a choice between maintaining the status quo and implementing changes to the CSFs in order to reduce or eliminate investment and transactional drag. Although one of the changes that plaintiffs suggested was eliminating unitization, other solutions were also proposed, such as imposing a trading limit to reduce the transaction costs generated by frequent traders. Because the fiduciaries could have addressed at least some of the problems identified by plaintiffs without abandoning unitization, the dissent's observation that nearly all company stock funds are unitized is beside the point.

of fiduciary duty will fail.[9] If plaintiffs establish that defendants should have made a decision, but defendants are able to show (1) that they made one and (2) that the decision involved "balancing competing interests under conditions of uncertainty," then the question will be whether the fiduciaries abused their discretion. *Armstrong*, 446 F.3d at 734.

Depending on how the above issues are resolved, the district court will have to consider whether any remedy is appropriate. If plaintiffs prove that defendants should have made a decision with respect to investment and transactional drag but did not, then plaintiffs would likely be entitled to an injunction requiring the fiduciaries to consider the proposed solutions to these issues and come to a decision. *See Brock v. Robbins*, 830 F.2d 640, 647-48 (7th Cir. 1987) (discussing availability of injunctive relief for breach of duty of prudence). Alternatively, the district court might determine that circumstances have changed since 2004, and that ordering the fiduciaries to consider these issues today would be pointless. In that case, the district court would award no prospective relief.

---

[9] In light of the dissent's concerns, we want to emphasize this sentence and repeat that we are not saying that the fiduciaries will necessarily have breached their fiduciary duties if they are found to have failed to make a decision on the issues raised by plaintiffs. If, as the dissent suggests, the issues are so trivial that a prudent fiduciary would have ignored them, then the failure to make a decision will not result in liability.

Plaintiffs might also seek an order compelling the fiduciaries to "make good to [the] plan" any losses caused by their breach of fiduciary duty. 29 U.S.C. § 1109(a). If the district court determines that the fiduciaries rendered a decision in 2004 and plaintiffs prove that the fiduciaries abused their discretion in making this decision, then the court could require the fiduciaries to make good any losses caused by this abuse. If, however, the court determines that the fiduciaries breached their fiduciary duties by failing to make a decision, then the question becomes whether plaintiffs can show that the failure to make a decision resulted in monetary loss. This might be difficult to do, in that it is impossible to know what would have happened had the fiduciaries made a decision. Nonetheless, the evidence may show that had the fiduciaries considered the appropriate factors they would have come to a decision that would have resulted in the CSFs performing better than they have over the past several years. For example, plaintiffs might be able to show that deciding to maintain the status quo would have been imprudent, and that any prudent alternative to the status quo would have improved the Plan's performance. We leave these matters for further exploration on remand, if necessary.

In sum, because we find that the record reveals a genuine issue of material fact as to whether defendants breached the prudent man standard of care by failing to make a reasoned decision under circumstances in which a prudent fiduciary would have done so, we reverse the district court's grant of summary judgment on this issue and remand for further consideration.

**B. Recordkeeping Fees**

Plaintiffs' next claim is that the Plan fiduciaries acted imprudently in connection with the fees paid to the Plan's recordkeeper, Hewitt, which are paid out of Plan assets. Hewitt has been the Plan's recordkeeper since 1995, when the Plan hired Hewitt after requesting bids from various recordkeepers. Since then, the Plan has extended Hewitt's contract a number of times. During the negotiations leading up to these extensions, the Plan fiduciaries engaged various consultants for advice as to the reasonableness of Hewitt's fees. However, since initially hiring Hewitt in 1995, the fiduciaries have not solicited competitive bids from other recordkeepers. During this time, the fees paid to Hewitt ranged between $43 and $65 per participant per year.

As we understand their claim, plaintiffs are arguing that prudent fiduciaries would have solicited competitive bids for recordkeeping services on a periodic basis—about once every three years—and that defendants' failure to solicit periodic bids after initially hiring Hewitt resulted in Hewitt receiving an excessive fee once its initial contract term expired. In support of this claim, plaintiffs offered the testimony of Lawrence R. Johnson, who has expertise in the area of retirement-plan recordkeeping services. Johnson reviewed the process that defendants followed when they extended Hewitt's contract and opined that defendants acted imprudently by extending the contract without first soliciting bids from other recordkeepers. Johnson further opined that a reasonable fee for the kind of

recordkeeping services the Plan needed would have been between $20 and $27 per participant per year, rather than the $43 to $65 the Plan paid to Hewitt.

In moving for summary judgment on this claim, defendants argued that prudence did not require them to solicit bids before extending Hewitt's contract. Defendants emphasized that they engaged several independent consultants for advice as to the reasonableness of Hewitt's fee and argued that in doing so they satisfied their duty to ensure that Hewitt's fees were reasonable.

The district court, in granting summary judgment to defendants, determined that Johnson's opinions were "of limited relevance" because Johnson's experience involved working with the retirement plans of mid-sized companies rather than the plans of large companies such as Kraft. (App. 64.) The court further determined that the Plan fiduciaries were told by their consultants that Hewitt's fees were reasonable, and that the Plan prudently relied on the advice of these consultants. Because we find that Johnson's opinions were relevant and admissible and that the fiduciaries were not necessarily prudent in relying on the advice of consultants in lieu of bids, we reverse the grant of summary judgment on this claim.

Regarding Johnson's opinions, if they are admissible they create a genuine issue of material fact as to whether defendants acted prudently. As noted, Johnson opines that prudent fiduciaries would have solicited competitive bids before extending Hewitt's contract, and that defendants' failure to solicit bids caused them to overpay Hewitt by at least $16 per participant per year. A reason-

able trier of fact could have credited Johnson's opinions and concluded that defendants' failure to solicit bids was imprudent. Moreover, defendants did not argue that Johnson's opinions were inadmissible under Federal Rule of Evidence 702, and the district court did not exclude his testimony on that basis. Rather, the district court determined that Johnson's opinions were "of limited relevance" due to his inexperience with large plans. (App. 64.) We do not understand this statement to be a ruling that Johnson's opinions were irrelevant and thus inadmissible under Rule 402.[10] Instead, the district court decided that Johnson's opinions were

---

[10] In any event, ruling that Johnson's opinions were irrelevant would have been an abuse of discretion, since his opinions went to the heart of plaintiffs' claim. On appeal, defendants argue that Johnson's opinions are irrelevant because they were based on what a mid-sized plan should have done. But defendants mischaracterize Johnson's opinions. He did not express his opinions in terms of what mid-sized or large plans should have done, but in terms of what the Kraft plan fiduciaries should have done. If defendants believed that Johnson was not qualified to render opinions as to what the Kraft plan should have done because his experience involved only mid-sized plans, then they should have argued that his opinions were inadmissible under Rule 702. They did not do so, and on appeal it is not obvious that Johnson was unqualified to render his opinions. Indeed, defendants have not pointed to any differences between the recordkeeping needs of mid-sized and large plans that would make experience with mid-sized plans an insufficient qualification for rendering an opinion about the recordkeeping needs of a large plan.

entitled to less weight because of his inexperience with large plans. But, of course, a district court may not weigh the evidence at the summary judgment stage; it must view the evidence in the light most favorable to the non-movant. *See, e.g., Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("[O]n summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts"). Thus, the district court erred by failing to assume that the trier of fact would have found Johnson's opinions credible.[11]

The district court further erred by determining at the summary judgment stage that defendants satisfied their duty of prudence by relying on the advice of their consultants. Although the fact that defendants engaged

---

[11] The dissent is concerned that ERISA fiduciaries will be subjected to distracting trials every time a plaintiff can find one "expert" who will testify that the recordkeeper's fee is too high. However, if the expert's opinion is a sham—as the dissent's use of scare quotes implies—then a defendant can argue that it is inadmissible under Rule 702, an argument that defendants in the present case did not make. Moreover, we are not suggesting that fiduciaries must choose the least expensive recordkeeper and ignore other considerations. If, as the dissent suggests, the fiduciaries have good reasons for preferring a more expensive recordkeeper, then the court may consider whether those reasons make the fee reasonable. In the present case, however, the defendants have not given reasons that would, as a matter of law, justify paying Hewitt a fee that is roughly double the fee that plaintiffs' expert says is reasonable for the kinds of services the Plan needed.

consultants and relied on their advice with respect to Hewitt's fee is certainly evidence of prudence, it is not sufficient to entitle defendants to judgment as a matter of law. *Keach v. U.S. Trust Co.*, 419 F.3d 626, 636-37 (7th Cir. 2005) (stating that relying on advice from outside consultant "is not a complete defense to a charge of imprudence"); *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (same); *Donovan v. Cunningham*, 716 F.2d 1455, 1474 (5th Cir. 1983) (stating that "[a]n independent appraisal is not a magic wand that fiduciaries may simply waive over a transaction to ensure that their responsibilities are fulfilled"); *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982) (stating that soliciting outside advice does not operate as a "complete whitewash" which, without more, satisfies ERISA's prudence requirement). Moreover, even if reliance on the advice of consultants were a complete defense, defendants' consultants did not unequivocally endorse the reasonableness of Hewitt's fee. In 2000, for example, one of the consultants, Buck, stated that Hewitt's fee "seemed" to be consistent with the standards of the industry and the prices of similar vendors. But Buck cautioned that "without an actual fee quote comparison"—i.e, a bid from another service provider—it "could not comment on the competitiveness of [Hewitt's] fee amount for the services provided." (Pls.' Stmt. of Add'l Facts ¶ 34.) Buck also opined that Hewitt should have offered a tiered pricing structure in which the per-participant cost went down as the number of participants went up. In this regard, Buck recommended that the cost per participant be $45 per year once the number of participants reached 30,000,

and that the cost decline to $35 per participant per year once the number of participants exceeded 40,000. The contract that defendants entered into with Hewitt in 2000 did not contain such a tiered pricing structure or anything similar.

Thus, after considering both the opinions of defendants' consultants and the opinions of plaintiffs' expert (along with any other admissible evidence), a trier of fact could reasonably conclude that defendants did not satisfy their duty to ensure that Hewitt's fees were reasonable. We therefore reverse the grant of summary judgment on this issue and remand for further proceedings.

**C. State Street's "Float" Income**

Plaintiffs' remaining claim involves the compensation paid to State Street. As noted, State Street was the Plan's trustee and held the Plan's assets. In addition to paying a fee for State Street's services, the Plan allowed State Street to retain interest income from "float." In general, float consists of a set of funds on deposit at two different financial institutions at the same time. *See* Thomas P. Fitch, *Dictionary of Banking Terms* 198 (5th ed. 2006); David L. Scott, *Wall Street Words* 152 (3d ed. 2003); http://en.wikipedia.org/wiki/Float_%28money_supply%29 (last viewed April 6, 2011). When a check is deposited with a financial institution, the financial institution credits the depositor's account with the amount of the check, allowing the depositor to earn interest on the funds immediately. However, until the check clears, the

funds remain on the books of the financial institution on which the check was written, and thus the person who wrote the check also continues to earn interest on the funds for a short time.

As applied to the present case, float refers to funds that remained on deposit at State Street pending clearance of a check written on Plan assets. When the Plan issued a check, State Street would set aside funds sufficient to cover the amount of the check in a separate account. However, until the check cleared, those funds could be used on a short-term basis to generate income. Under State Street's agreement with the Plan, State Street was allowed to retain the income earned from float. Absent this agreement, any float income would have been property of the Plan.

The amount of float income earned over a period of time varies depending on a number of factors, including the number of checks written and interest rates. Plaintiffs argue that defendants failed to determine how much float income State Street was earning. Plaintiffs further argue that unless defendants knew how much float income State Street was earning, they could not satisfy their fiduciary duty to ensure that State Street's total compensation (fees + float income) was reasonable. The district court granted summary judgment to defendants on this claim, and we affirm.

A key component of plaintiffs' claim is their contention that defendants did not know the amount of State Street's float income. However, in support of their summary judgment motion, defendants submitted a declara-

tion from a Plan fiduciary stating that defendants received annual reports from State Street that disclosed the dollar amount of State Street's float income. (Dolsen Decl. ¶ 14.) Plaintiffs did not produce any evidence contradicting this statement in opposition to defendants' motion for summary judgment, and they do not point to any such evidence on appeal. Thus, as far as the record reveals, it is undisputed that defendants received annual reports regarding State Street's float income. Moreover, plaintiffs do not show that defendants failed to review these reports, and they do not point to any other steps that prudent fiduciaries would have taken to ensure that State Street's total compensation was not excessive. Instead, plaintiffs emphasize that defendants have not disclosed the actual dollar amount of the float income retained by State Street. But we fail to see why that is a problem. Plaintiffs do not direct us to an interrogatory, deposition question, or other discovery request in which they asked defendants to identify the amount of State Street's float income, and thus the absence of any evidence in the record as to the amount of this income does not give rise to an inference that defendants did not know what it was. Accordingly, the district court properly granted summary judgment on this claim.[12]

_____

[12] Plaintiffs argue that because one of the remedies they seek is an accounting of the float income retained by State Street, the district court should have ordered defendants to disclose the amount of State Street's float income even though plaintiffs did not attempt to determine that amount during discovery. But

(continued...)

## V. Conclusion

For the reasons stated, we affirm the district court's order denying leave to file an amended complaint along with its decision to exclude evidence from Dr. O'Neal. With respect to the court's grant of summary judgment to defendants, we AFFIRM IN PART, REVERSE IN PART, and remand for further proceedings consistent with this opinion.

---

[12] (...continued)

an accounting is an equitable remedy, *Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1022 (7th Cir. 2002), and therefore plaintiffs must at least demonstrate that equity requires defendants to account for the float income retained by State Street. On the present record, we have no reason to think that plaintiffs could not have determined the amount of float income for themselves by exploring the issue during discovery. Thus, equity did not require an accounting. In any event, an accounting of the type plaintiffs seek is a remedy for breach of fiduciary duty. *See Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1008-09 (8th Cir. 2004). As explained in the text, plaintiffs failed to create a triable issue as to whether defendants breached their fiduciary duties with respect to State Street's float income, and therefore plaintiffs were not entitled to an accounting.

CUDAHY, *Circuit Judge*, concurring in part and dissenting in part. This is an implausible class action based on nitpicking with respect to perfectly legitimate practices of the fiduciaries. I would therefore affirm the excellent district court opinion throughout, including the summary judgment matters the majority chooses to reverse.

A particularly egregious issue involves the practice of including minor amounts of cash in the Plan's company stock funds ("unitization"). This is, of course, a form of hedging—now elevated to the ominous-sounding level of "investment drag." And this investment drag is allegedly compounded by "transactional drag," which is another way of saying that trading costs are shared (perfectly appropriately) pro rata among participants instead of allocated to individual investors. Apparently, the failure of the trustee-defendants to make a "reasoned decision" on the record between unitization and the alternative practice of "real-time trading" is a basis for finding them in breach of their fiduciary duty. But the majority points to no provision of ERISA that would require a reasoned decision on the record about such a universally accepted investment practice as unitization.[1]

---

[1] The cases the majority cites for the proposition that a demonstrable exercise of discretion was required are entirely distinguishable and do not involve routine investment practices. In *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007), a demonstrable exercise of discretion was required with

(continued...)

Hedging, involving the inclusion of small quantities of cash in the trading unit, has the effect of preventing the maximum realization of gain in bull markets or the maximum realization of loss when the market declines. This form of hedging is apparently present in the over-whelming majority of managed fiduciary funds investing in employer stock.[2] It has been adopted perhaps for the various administrative benefits asserted by the de-

---

[1] (...continued)
respect to the retention of an investment company stock during a period when the company's viability was in question, and in *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733-34 (7th Cir. 2006), a demonstrable exercise of discretion was required in valuing company stock where the company recently purchased a large new subsidiary.

[2] *See* Robert Rachal *et al.*, *Fiduciary Duties Regarding 401(k) and ESOP Investments in Employer Stock, in ERISA Litigation*, 783, 790 n. 17 (Jayne E. Zanglein & Susan J. Stabile, eds., 3d ed. 2008) ("Because unitization lowers transaction costs and allows participants to invest their money on the day of the fund exchange, most employer stock funds for publicly traded companies are unitized."). A 2010 version of the same chapter, evidently not yet available in print, indicates that the prevalence of unitized stock funds may be as high as 90%. *See* Robert Rachal *et al.*, *ERISA Fiduciary Duties Regarding 401(k) & ESOP Investments in Employer Stock* 9 n. 23 (2010), *available at* http://swba.org/members_only/conference_presentations/fall_2010/ERISA_Litigation_Article.pdf.

fendants[3]—or for the investment rationale that it reduces risk (as well as reward). Whether or not to hedge your bets is an investment decision, and hardly a matter outside of the ordinary discretion of the fiduciaries. It is obviously a matter every investor must routinely consider and decide. But I see no ERISA requirement that the pros and cons be spread on the record and the balance assessed. This is part of the ABC's of investing—not some sort of esoterica. What the trustees did here is well within their discretion, both from an administrative and an investment standpoint, and should not become the subject of a federal lawsuit.

As to the other matter in which the majority has reversed summary judgment, an allegedly excessive fee for record-keeping service, the issue is much closer than the unitization question but also less fundamental and significant. In fact, the cases the majority cites for the proposition that obtaining outside assessments does not adequately demonstrate prudence are entirely distinguishable, and involve ethically sensitive matters unlike the size of fees paid to an outside record-keeping service.[4] It is hard to determine exactly what the majority's

---

[3] As the majority explained, among the most prominent administrative advantages of unitization is that by maintaining cash in the company stock plan, the fiduciaries can satisfy withdrawals immediately instead of selling company stock on the open market and incurring transaction fees.

[4] For instance, in *Keach v. U.S. Trust Co.*, 419 F.3d 626 (7th Cir. 2005), we stated that securing an independent assessment was not a complete defense to a charge of imprudency in the

(continued...)

holding means for ERISA fiduciaries. The advice of con-
sultants is not good enough to justify a fee, but competi-
tive bidding may not always be required. So what is
adequate to support a fee without fear of litigation? If
plaintiffs can find one "expert" who will testify that the
fee is too high, must there be a trial? Here, the trustees
have a relationship with Hewitt going back fifteen years.
They have a good sense of the dimensions of the job and
Hewitt's performance in carrying it out. Must they sub-
stitute any lower bidder that happens along? These are
difficult questions and they leave room for the discre-
tion which fiduciaries must be granted to perform their
task. Holding otherwise will only serve to steer their
attention toward avoiding litigation instead of managing
employee wealth.

  I would be content with the opinion of the district court
on these matters. And I therefore respectfully dissent.

---

[4] (...continued)
context of considering the propriety of a self-dealing purchase
of securities that had no recognized market value. *Id*. at 636-37.
*Howard v. Shay*, 100 F.3d 1484 (9th Cir. 1996), and *Donovan
v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982), likewise concerned
fiduciaries seeking independent advice prior to engaging in
transactions involving a conflict of interest. *Donovan v.
Cunningham*, 716 F.2d 1455 (5th Cir. 1983), involved a
fiduciary's reliance on an old valuation of closely held
stock, again in a self-dealing transaction.