Jander v. International

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————

August Term, 2018

(Argued: September 7, 2018       Decided: December 10, 2018)

Docket No. 17-3518

————————

LARRY W. JANDER, and all other individuals similarly situated, RICHARD J. WAKSMAN,

*Plaintiffs-Appellants*,

—v.—

RETIREMENT PLANS COMITTEE OF IBM, RICHARD CARROLL, ROBERT WEBER, MARTIN SCHROETER, *Defendants-Appellees*,

INTERNATIONAL BUSINESS MACHINES CORPORATION, *Defendant*.

————————

B e f o r e:

KATZMANN, *Chief Judge*, SACK AND RAGGI, *Circuit Judges*.

1

_____

Plaintiffs-appellants Larry Jander and Richard Waksman appeal from a judgment of the Southern District of New York (Pauley, *J.*) dismissing their suit against fiduciaries of IBM's employee stock option plan ("ESOP"). Plaintiffs-appellants claim that the defendants violated their duty under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1104(a)(1)(B), to manage the ESOP's assets prudently, because they knew but failed to disclose that IBM's microelectronics division (and thus IBM's stock) was overvalued. The district court determined that plaintiffs-appellants did not plausibly plead a violation of ERISA's duty of prudence, because a prudent fiduciary could have concluded that earlier corrective disclosure would have done more harm than good. On appeal, plaintiffs-appellants assert that this standard is stricter than the one set out in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), and that the district court and others have applied this stricter standard in a manner that makes it functionally impossible to plead a duty-of-prudence violation. We find it unnecessary to determine whether plaintiffs-appellants are correct, because they plausibly plead a duty-of-prudence claim even under the stricter standard used by the district court. Accordingly, the judgment of the district court is **REVERSED** and the case is **REMANDED** for further proceedings.

_____

SAMUEL E. BONDEROFF (argued), JACOB H. ZAMANSKY, Zamansky LLC, New York, NY, *for Plaintiffs-Appellants*.

LAWRENCE PORTNOY (argued), J. STAN BARRETT, MICHAEL S. FLYNN, W. TRENT THOMPSON, Davis Polk & Wardwell LLP, New York, NY, *for Defendants-Appellees*.

_____

KATZMANN, *Chief Judge*:

The Employee Retirement Income Security Act ("ERISA") requires fiduciaries of retirement plans to manage the plans' assets prudently. 29 U.S.C. § 1104(a)(1)(B). One form of retirement plan, the employee stock option plan ("ESOP"), primarily invests in the common stock of the plan participant's employer. This case asks what standard one must meet to plausibly allege that fiduciaries of an ESOP have violated ERISA's duty of prudence.

The plaintiffs here, IBM employees who were participants in the company's ESOP, claim that the plan's fiduciaries knew that a division of the company was overvalued but failed to disclose that fact. This failure, the plaintiffs allege, artificially inflated IBM's stock price, harming the ESOP's members. To state a duty-of-prudence claim, plaintiffs must plausibly allege that a proposed alternative action would not have done more harm than good. The parties disagree about how high a standard the plaintiffs must meet to make this showing. However, we need not resolve this dispute today, because we find that the plaintiffs have plausibly alleged an ERISA violation even under a more

3

restrictive interpretation of recent Supreme Court rulings. We therefore **REVERSE** the district court's judgment dismissing this case and **REMAND** for further proceedings.

## BACKGROUND

Plaintiffs-appellants Larry Jander and Richard Waksman, along with other unnamed plaintiffs (collectively, "Jander"), are participants in IBM's retirement plan. They invested in the IBM Company Stock Fund, an ESOP governed by ERISA. During the relevant time period, defendants-appellees the Retirement Plans Committee of IBM, Richard Carroll, Robert Weber, and Martin Schroeter (collectively, "the Plan defendants") were fiduciaries charged with overseeing the retirement plan's management. The individual defendants were also part of IBM's senior leadership: Carroll was the Chief Accounting Officer, Schroeter the Chief Financial Officer, and Weber the General Counsel.

Jander alleges that IBM began trying to find buyers for its microelectronics business in 2013, at which time that business was on track to incur annual losses of $700 million. Through what Jander deems accounting legerdemain, IBM failed to publicly disclose these losses and continued to value the business at

4

approximately $2 billion. It is further alleged that the Plan defendants knew or should have known about these undisclosed issues with the microelectronics business. On October 20, 2014, IBM announced the sale of the microelectronics business to GlobalFoundries Inc. The announcement revealed that IBM would pay $1.5 billion to GlobalFoundries to take the business off IBM's hands and supply it with semiconductors, and that IBM would take a $4.7 billion pre-tax charge, reflecting in part an impairment in the stated value of the microelectronics business. Thereafter, IBM's stock price declined by more than $12.00 per share, spawning two pertinent lawsuits.

The first is *International Ass'n of Heat & Frost Insulators & Asbestos Workers Local #6 Pension Fund v. International Business Machines Corp.*, 205 F. Supp. 3d 527 (S.D.N.Y. 2016) ("*Insulators*"), a securities fraud class action that was dismissed on September 7, 2016. The district court found that the investor plaintiffs had "plausibly plead[ed] that Microelectronics' decreased value, combined with its operating losses, may have constituted an impairment indicator under" Generally Accepted Accounting Principles ("GAAP"). *Id.* at 535. The district court nevertheless dismissed the claims because the plaintiffs "fail[ed] to raise a

5

strong inference that the need to write-down Microelectronics was so apparent to Defendants before the announcement, that a failure to take an earlier write-down amount[ed] to fraud," *id.* at 537 (internal quotation marks and alterations omitted), or that the defendants knew that IBM's earnings-per-share projections "lacked a reasonable basis when they were made," *id.* at 537-38. That decision has not been appealed.

The second action is this case. Here, Jander alleges that the Plan defendants continued to invest the ESOP's funds in IBM common stock despite the Plan defendants' knowledge of undisclosed troubles relating to IBM's microelectronics business. In doing so, Jander alleges, the Plan defendants violated their fiduciary duty of prudence to the pensioner plaintiffs under ERISA. The plaintiffs also pleaded that "once Defendants learned that IBM's stock price was artificially inflated, Defendants should have either disclosed the truth about Microelectronics' value or issued new investment guidelines that would temporarily freeze further investments in IBM stock." *Jander v. Int'l Bus. Mach. Corp.*, 205 F. Supp. 3d 538, 544 (S.D.N.Y. 2016) ("*Jander I*").

The district court first dismissed Jander's case on the same day it decided

the securities fraud lawsuit. *See id.* at 540-41. As an initial matter, the district court relied on the reasoning set forth in its securities fraud decision to find that the pensioner plaintiffs had "plausibly pled that IBM's Microelectronics unit was impaired and that the Plan fiduciaries were aware of its impairment." *Id.* at 542. The court noted that knowledge was a sufficient level of scienter because ERISA plaintiffs need not meet the heightened pleading standards that apply in securities actions. *Id.* But the district court nevertheless dismissed the action because Jander had "fail[ed] to plead facts giving rise to an inference that Defendants 'could not have concluded' that public disclosures, or halting the Plan from further investing in IBM stock, were more likely to harm than help the fund." *Id.* at 545 (citing *Fifth Third*, 134 S. Ct. at 2472).

Rather than dismiss the action with prejudice, however, the district court granted Jander an opportunity to file a second amended complaint. *Id.* at 546. Jander availed himself of that opportunity, adding further details and alleging a third alternative by which the Plan defendants could have avoided breaching their fiduciary duty: by purchasing hedging products to mitigate potential declines in the value of IBM common stock. The district court again found

7

lacking the allegations concerning the three alternatives available to the Plan

defendants, determining that each might have caused more harm than good.

*Jander v. Ret. Plans Comm. of IBM*, 272 F. Supp. 3d 444, 451-54 (S.D.N.Y. 2017)

("*Jander II*"). This appeal followed.

## DISCUSSION

### I.    Standard of Review

"To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint

must allege sufficient facts, taken as true, to state a plausible claim for relief. We

review *de novo* a dismissal for failure to state a claim, accepting as true all

material factual allegations in the complaint and drawing all reasonable

inferences in plaintiffs' favor." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d

Cir. 2013) (citation omitted).

### II. Duty of Prudence

"The central purpose of ERISA is to protect beneficiaries of employee

benefit plans . . . ." *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir.

2009). Among the "important mechanisms for furthering ERISA's remedial

purpose" are "private actions by beneficiaries seeking in good faith to secure

8

their rights." *Salovaara v. Eckert*, 222 F.3d 19, 28 (2d Cir. 2000) (internal quotation mark omitted) (quoting *Meredith v. Navistar Int'l Transp. Corp.*, 935 F.2d 124, 128-29 (7th Cir. 1991)). Such private actions include claims against a fiduciary for breach of the statutorily imposed duty of prudence. *See* 29 U.S.C. § 1104(a)(1) ("[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."). The sole question at issue in this appeal is whether Jander has plausibly pleaded that the Plan defendants violated this duty.

## A.    ERISA's Duty-of Prudence Standard

The parties disagree first and most fundamentally about what the plaintiffs must plead to state a duty-of-prudence claim under ERISA. Their arguments are premised on competing readings of two recent decisions by the United States Supreme Court and differing views of how they interact with the decisions of our sister circuits. Some background is therefore in order.

Prior to 2014, a consensus had formed that ESOP fiduciaries were entitled to a presumption that their fund management was prudent. This view was first articulated by the Third Circuit, which reasoned that "an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision" because "when an ESOP is created, it becomes simply a trust under which the trustee is directed to invest the assets primarily in the stock of a single company," a function that "serves a purpose explicitly approved and encouraged by Congress." *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995). As adopted by this Court, the presumption held that "only circumstances placing the employer in a dire situation that was objectively unforeseeable by the [plan] settlor could require fiduciaries to override plan terms" by ceasing investment in the employer, a standard that would "serve as a substantial shield that should protect fiduciaries from liability where there is room for reasonable fiduciaries to disagree as to whether they are bound to divest from company stock." *In re Citigroup ERISA Litig.*, 662 F.3d 128, 140 (2d Cir. 2011) (internal quotation marks and citations omitted). Other circuits

10

agreed, although the precise formulation and application of the presumption in favor of fiduciaries differed.[1]

In 2014, the Supreme Court definitively rejected the presumption of prudence in *Fifth Third Bancorp v. Dudenhoeffer*, which held that "the law does not create a special presumption favoring ESOP fiduciaries." 134 S. Ct. 2459, 2467 (2014). The Court recognized that there is a "legitimate" concern that "subjecting ESOP fiduciaries to a duty of prudence without the protection of a special presumption will lead to conflicts with the legal prohibition on insider trading," given that "ESOP fiduciaries often are company insiders" subject to allegations that they "were imprudent in failing to act on inside information they had about the value of the employer's stock." *Id.* at 2469. Nevertheless, the Court reasoned

---

[1] *See, e.g.*, *White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 989 (7th Cir. 2013) ("[P]laintiffs . . . must allege . . . that the company faced impending collapse or dire circumstances that could not have been foreseen by the founder of the plan." (internal quotation marks omitted)); *Quan v. Comput. Sci. Corp.*, 623 F.3d 870, 882 (9th Cir. 2010) ("[P]laintiffs must . . . make allegations that clearly implicate the company's viability as an ongoing concern or show a precipitous decline in the employer's stock combined with evidence that the company is on the brink of collapse or is undergoing serious mismanagement." (internal quotation marks and alterations omitted)); *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995) ("A plaintiff may . . . rebut th[e] presumption of reasonableness by showing that a prudent fiduciary acting under similar circumstances would have made a different investment decision.").

that "an ESOP-specific rule that a fiduciary does not act imprudently in buying or holding company stock unless the company is on the brink of collapse (or the like) is an ill-fitting means of addressing" that issue. *Id.*

Similarly, the Court "agree[d] that Congress sought to encourage the creation of ESOPs"; the Court thus "recognized that 'ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans.'" *Id.* at 2470 (quoting *Conkright v. Frommert*, 559 U.S. 506, 517 (2010)). Still, it concluded that the presumption of prudence was not "an appropriate way to weed out meritless lawsuits or to provide the requisite 'balancing.'" *Id.* The correct standard must "readily divide the plausible sheep from the meritless goats," a task that is "better accomplished through careful, context-sensitive scrutiny of a complaint's allegations." *Id.* Notably, the Court criticized the presumption of prudence as "mak[ing] it impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious, unless the employer is in very bad economic circumstances." *Id.*

After rejecting the pro-fiduciary presumption, *Fifth Third* "consider[ed]

more fully one important mechanism for weeding out meritless claims, the motion to dismiss for failure to state a claim." *Id.* at 2471. The Court first determined that a duty-of-prudence claim may lie against ESOP fiduciaries only where it is alleged that fiduciaries "behaved imprudently by failing to act on the basis of *nonpublic* information that was available to them because they were [corporate] insiders." *Id.* at 2472. To plead such a claim, plaintiffs must "plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it." *Id.*

In analyzing any proposed alternative action, three considerations are to "inform the requisite analysis." *Id.* First, the "duty of prudence cannot require an ESOP fiduciary to perform an action—such as divesting the fund's holdings of the employer's stock on the basis of inside information—that would violate the securities laws." *Id.* Second, "where a complaint faults fiduciaries for failing to decide, on the basis of the inside information, to refrain from making additional stock purchases or for failing to disclose that information to the public so that the

stock would no longer be overvalued, . . . courts should consider" whether such actions "could conflict with the complex insider trading and corporate disclosure requirements imposed by the federal securities laws or with the objectives of those laws." *Id.* at 2473. And <u>third</u>, courts assessing these same alternatives "should also consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded" that those alternatives "would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." *Id.*

This last consideration is the source of the parties' dispute here. The Court first set out a test that asked whether "a prudent fiduciary in the same circumstances *would* not have viewed [an alternative action] as more likely to harm the fund than to help it." *Id.* at 2472 (emphasis added). This formulation suggests that courts ask what an average prudent fiduciary might have thought. But then, only a short while later in the same decision, the Court required judges to assess whether a prudent fiduciary "*could* not have concluded" that the action would do more harm than good by dropping the stock price. *Id.* at 2473

14

(emphasis added). This latter formulation appears to ask, not whether the *average* prudent fiduciary would have thought the alternative action would do more harm than good, but rather whether *any* prudent fiduciary could have considered the action to be more harmful than helpful. It is not clear which of these tests determine whether a plaintiff has plausibly alleged that the actions a defendant took were imprudent in light of available alternatives.

Lower courts have struggled with how to apply the Court's decision in the ensuing years, and the high court has yet to resolve the interpretive difficulties. In the wake of *Fifth Third*, the Ninth Circuit reversed a district court's dismissal of ERISA claims based, in part, on alleged breaches of the duty of prudence in light of the fiduciaries' inside information. *Harris v. Amgen, Inc.*, 770 F.3d 865 (9th Cir. 2014), *amended and superseded*, 788 F.3d 916 (9th Cir. 2015), *rev'd*, 136 S. Ct. 758 (2016). The court rejected Amgen's argument that removing the ESOP fund as an investment option would have risked causing the employer's stock price to drop. Though the Ninth Circuit acknowledged that removing the fund "would have sent a negative signal to investors if the fact of the removal had been made public," the court determined that it would do so by implicitly disclosing that the

15

company was experiencing problems; thus, "the ultimate decline in price would have been no more than the amount by which the price was artificially inflated." *Id.* at 878. The court also rejected Amgen's argument that defendants could not legally remove the fund based on inside information, finding that declining to allow additional investments "would not thereby have violated the prohibition against insider trading, for there is no violation absent purchase or sale of stock." *Id.* at 879. Moreover, the court explained, this supposed conundrum could have been easily resolved "[i]f defendants had revealed material information in a timely fashion to the general public (including plan participants)," which "would have simultaneously satisfied their duties under both the securities laws and ERISA." *Id.* at 878-79.

The Supreme Court summarily reversed the Ninth Circuit, holding that it failed to adequately scrutinize the plaintiffs' pleadings. *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (2016) (per curiam). The Court did not reject the Ninth Circuit's reasoning outright. Rather, it found a mismatch between that reasoning and the allegations in the "current form" of the complaint regarding whether "a prudent fiduciary in the same position 'could not have concluded' that the alternative

action 'would do more harm than good.'" *Id.* (quoting *Fifth Third*, 134 S. Ct. at 2473). The Court stated:

> The Ninth Circuit's proposition that removing the Amgen Common Stock Fund from the list of investment options was an alternative action that could plausibly have satisfied *Fifth Third*'s standards may be true. If so, the facts and allegations supporting that proposition should appear in the stockholders' complaint. Having examined the complaint, the Court has not found sufficient facts and allegations to state a claim for breach of the duty of prudence.

*Id.* "*Amgen*'s analysis, however, neglects to offer any guidance about what facts a plaintiff must plead to state a plausible claim for relief." *Saumer v. Cliffs Nat. Res. Inc.*, 853 F.3d 855, 865 (6th Cir. 2017). This is in part because the complaint in *Amgen* included no allegations regarding proposed alternative actions beyond the bare assertion that they were available.[2] Accordingly, *Amgen*'s import could

---

[2] The relevant allegations in the *Amgen* complaint are found in a single paragraph that is repeated twice *verbatim*:

> Defendants had available to them several different options for satisfying this duty, including: making appropriate disclosures as necessary; divesting the Plan of Company Stock; precluding additional investment in Company Stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as fiduciaries of the Plan . . . .

*Harris v. Amgen, Inc.*, No. 07 Civ. 5442, Dkt. No. 168, ¶¶ 290, 344 (C.D. Cal. Mar. 23, 2010). These alternatives were not fleshed out in any further detail and the complaint

be interpreted in multiple ways. It might clarify what was implicit in *Fifth Third*: that allegations about why an alternative action would do more good than harm must appear in the complaint itself, not merely in a court's opinion. Or it might instead confirm that the "could not have concluded" language from *Fifth Third* created a separate standard that must independently be satisfied to plead a duty-of-prudence claim.

The parties spar over which of these two interpretations is correct. The Plan defendants urge us to view *Fifth Third* and *Amgen* as setting out a restrictive test, noting that at least two of our sister circuits have adopted that interpretation. *See Saumers*, 853 F.3d at 864-65; *Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016). Jander notes that no duty-of-prudence claim against an ESOP fiduciary has passed the motion-to-dismiss stage since *Amgen*, and he asserts that the courts—and the Plan defendants—have misread that decision. According to Jander, imposing such a heavy burden at the motion-to-dismiss stage runs contrary to the Supreme Court's stated desire in *Fifth Third* to lower the barrier set by the presumption of prudence. Our sole precedential post-*Amgen* duty-of-

was never amended following *Fifth Third*.

prudence opinion does not explicitly take a side in this dispute. *See Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016), *cert. denied,* 137 S. Ct. 1067 (2017).

We need not here decide which of the two standards the parties champion is correct, however, because we find that Jander plausibly pleads a duty-of-prudence claim even under the more restrictive "could not have concluded" test.

B.      **The Plaintiffs' Duty-of-Prudence Claim**

The district court held that Jander failed to state a duty-of-prudence claim under ERISA because a prudent fiduciary could have concluded that the three alternative actions proposed in the complaint—disclosure, halting trades of IBM stock, or purchasing a hedging product—would do more harm than good to the fund. We respectfully disagree. Jander has limited the proposed alternative actions on appeal to just one: early corrective disclosure of the microelectronics division's impairment, conducted alongside the regular SEC reporting process. Several allegations in the amended complaint, considered in combination and "draw[ing] all reasonable inferences in plaintiff's favor," *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012) (citation omitted), plausibly

19

establish that a prudent fiduciary in the Plan defendants' position could not have concluded that corrective disclosure would do more harm than good.

First, the Plan defendants allegedly knew that IBM stock was artificially inflated through accounting violations. As the district court found, Jander has plausibly alleged a GAAP violation, and "in view of the lower pleading standards applicable to an ERISA action, [he has] plausibly pled that IBM's Microelectronics unit was impaired and that the Plan fiduciaries were aware of its impairment." *Jander I*, 205 F. Supp. 3d at 542.

Second, the Plan defendants allegedly "had the power to disclose the truth to the public and correct the artificial inflation." App. 85. Two of the Plan defendants "were uniquely situated to fix this problem inasmuch as they had primary responsibility for the public disclosures that had artificially inflated the stock price to begin with." *Id.* The district court thought that the complaint failed to account for the risks that "an unusual disclosure outside the securities laws' normal reporting regime could spook the market, causing a more significant drop in price than if the disclosure were made through the customary procedures." *Jander II*, 272 F. Supp. 3d at 451 (citation omitted). This reasoning

20

assumes that any disclosure would have to have been "outside the securities' laws normal reporting regime." *Id.* Yet the class period here runs from January through October 2014. The amended complaint therefore plausibly alleges that disclosures could have been included within IBM's quarterly SEC filings and disclosed to the ESOP's beneficiaries at the same time in the Plan defendants' fiduciary capacity. *See* App. 60-61.

Third, Jander alleges that the defendants' failure promptly to disclose the value of IBM's microelectronics division "hurt management's credibility and the long-term prospects of IBM as an investment" because the eventual disclosure of a prolonged fraud causes "reputational damage" that "increases the longer the fraud goes on[]." App. 87. The district court dismissed this allegation as an "argument [that] rests on hindsight," which "says nothing about what a prudent fiduciary would have concluded under the circumstances then prevailing." *Jander II*, 272 F. Supp. 3d at 450. But Jander's argument is not retrospective. A reasonable business executive could plausibly foresee that the inevitable disclosure of longstanding corporate fraud would reflect badly on the company and undermine faith in its future pronouncements. Moreover, Jander bolsters

this inference by citing economic analyses that show that reputational harm is a common result of fraud and grows the longer the fraud is concealed, translating into larger stock drops.

The court below rejected the argument that an earlier disclosure would have minimized the eventual stock price correction, on the ground that it was "not particular to the facts of this case and could be made by plaintiffs in any case asserting a breach of ERISA's duty of prudence." *Jander II*, 272 F. Supp. 3d at 449 (quoting *Jander I*, 205 F. Supp. 3d at 546); *see also id.* at 450 & n.2. (criticizing plaintiffs for not "retaining an expert to perform a quantitative analysis to show more precisely how Plan participants are harmed . . . by purchasing Fund shares at artificially high prices" but further noting that "even that may not be enough" to state a claim). And although Jander cited a number of economic studies to support his argument, the court said that this evidence "only underscores the general, theoretical, and untested nature of [the] allegations." *Id.* at 449.

However, the possibility of similar allegations in other ERISA cases does not undermine their plausibility here (or, for that matter, elsewhere), nor does it mean that the district court should not have considered them. To the contrary, in

evaluating the defendants' motion to dismiss, the district court was required to accept the complaint's well-pleaded allegations as true. Assertions grounded in economic studies of general market experience cannot be dismissed as merely "theoretical," and the fact that they are "untested" at this early stage of the litigation does not necessarily render them implausible. Moreover, as Jander points out, there are a number of other determinations that must be made in a fact-specific way before these allegations come into play: whether there was an ongoing act of concealment, for instance, and whether that concealment was known by the fiduciaries such that further investigation would not be needed and disclosure would not be premature. Courts would also have to assess whether the circumstances would nevertheless have made immediate disclosure particularly dangerous, such that the generalized economic analyses put forward here would not apply. *See, e.g.*, *Rinehart*, 817 F.3d at 68 ("A prudent fiduciary could have concluded that divesting Lehman stock, or simply holding it without purchasing more, would do more harm than good. Such an alternative action in the summer of 2008 could have had dire consequences." (citation and internal quotation marks omitted)). While these economic analyses will usually not be

23

enough on their own to plead a duty-of-prudence violation, they may be considered as part of the overall picture.

Fourth, the complaint alleges that "IBM stock traded in an efficient market," such that "correcting the Company's fraud would reduce IBM's stock price only by the amount by which it was artificially inflated." App. 51. It is well established that "the market price of shares traded on well-developed markets reflects all publicly available information." *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988). Accordingly, Jander plausibly alleges that a prudent fiduciary need not fear an irrational overreaction to the disclosure of fraud.[3]

Fifth and finally, the defendants allegedly knew that disclosure of the truth regarding IBM's microelectronics business was inevitable, because IBM was likely to sell the business and would be unable to hide its overvaluation from the public at that point. *See* App. 88. This allegation is particularly important. In the normal case, when the prudent fiduciary asks whether disclosure would do more harm than good, the fiduciary is making a comparison only to the status quo of

---

[3] This is not inconsistent with the prior allegation regarding reputational harm. Rational investors could well conclude that companies that allow fraud to continue longer are more poorly run, for example.

non-disclosure. In this case, however, the prudent fiduciary would have to compare the benefits and costs of earlier disclosure to those of later disclosure—non-disclosure is no longer a realistic point of comparison. Accordingly, when a "drop in the value of the stock already held by the fund" is inevitable, *Fifth Third*, 134 S. Ct. at 2473, it is far more plausible that a prudent fiduciary would prefer to limit the effects of the stock's artificial inflation on the ESOP's beneficiaries through prompt disclosure.

The district court thought that the potential sale of the microelectronics business cut the other way. *Jander II*, 272 F. Supp. 3d at 451 (theorizing that a prudent fiduciary could think disclosure might "spook potential buyers"). But we think any potential purchaser would surely conduct its own due diligence of the business prior to purchasing it. In that context, it makes little sense to fear "spooking" a potential buyer by publicly disclosing what that buyer would surely discover on its own. Accordingly, a prudent fiduciary would have known that a potential purchaser's due diligence would likely result in discovery of the business's problems in any event. Indeed, that is precisely what appears to have occurred, as IBM paid $1.5 billion to GlobalFoundries as part of its sale of the

microelectronics business, the announcement of which constituted corrective disclosure to the public markets in this action. The allegations regarding the sale of the microelectronics business, far from undermining Jander's duty-of-prudence claim, instead tip the scales toward plausibility.

The Plan defendants have one arrow left in their quiver. According to the district court, Jander's corrective disclosure theory did not sufficiently account for the effect of disclosure on "the value of the stock already held by the fund." *Fifth Third*, 134 S. Ct. at 2473. Specifically, the court found that the complaint failed to satisfy *Fifth Third* in part because "even if the stock price dropped marginally as a result of a corrective disclosure, the net effect of that drop on more than $110 million purchased by Plan participants could have been substantial." *Jander II*, 272 F. Supp. 3d at 450. But, as described above, non-disclosure of IBM's troubles was no longer a realistic option, and a stock-drop following early disclosure would be no more harmful than the inevitable stock drop that would occur following a later disclosure. Thus, contrary to the district court's conclusion, the effect of disclosure on "the value of the stock already held by the fund," *Fifth Third*, 134 S. Ct. at 1473, does not point in defendants' favor.

To be sure, further record development might not support findings so favorable to Jander and adverse to the Plan defendants. But drawing all reasonable inferences in Jander's favor, as we are required to do at this stage, and keeping in mind that the standard is plausibility—not likelihood or certainty—we conclude that Jander has sufficiently pleaded that no prudent fiduciary in the Plan defendants' position could have concluded that earlier disclosure would do more harm than good. We therefore hold that Jander has stated a claim for violation of ERISA's duty of prudence.

## III.    The Interplay Between the ERISA and Securities Fraud Suits

One issue remains for us to address: the relevance, if any, of the parallel securities fraud suit against IBM. As already noted, the district court dismissed that case, and the plaintiffs did not appeal. The district court found that the plaintiffs had "fail[ed] to raise a strong inference that the need to write-down Microelectronics was so apparent to Defendants before the announcement, that a failure to take an earlier write-down amounts to fraud," or that the Plan defendants knew that IBM's earnings-per-share projections "lacked a reasonable basis when they were made." *Insulators*, 205 F. Supp. 3d at 537-38 (internal

27

quotation marks and alterations omitted). The plaintiffs therefore could not plausibly plead scienter. *Id.* at 535, 537-38. The Plan defendants assert that allowing Jander's ERISA claim to go forward on essentially the same facts would lead to an end run around the heightened pleading standards for securities fraud suits set out in the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). While this concern is not without merit, it does not provide a basis to affirm the district court's dismissal of Jander's duty-of-prudence claim.

The *Insulators* holding is not preclusive as to this case, because the PSLRA does not apply to ERISA actions. "No heightened pleading standard applies [to duty-of-prudence claims]; it is enough to provide the context necessary to show a plausible claim for relief." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 674 (7th Cir. 2016); *see also Rogers v. Baxter Int'l, Inc.*, 521 F.3d 702, 705 (7th Cir. 2008) (holding that the PSLRA does not apply to ERISA claims). This is clear from the text of the PSLRA itself, which is limited to actions under the securities laws. *See* Pub. L. No. 104-67, tit. I, § 101(b) (codified as amended at 15 U.S.C. § 78u-4(a)(1)) ("The provisions of this subsection shall apply in each private action arising under this title [Title 15] that is brought as a plaintiff class action pursuant to the Federal

Rules of Civil Procedure."); 15 U.S.C. § 78u-4(a)(1) (limiting the PSLRA's reach to any "private action arising under this chapter [the Securities Exchange Act of 1934] that is brought as a plaintiff class action"). Additionally, the legislative history of the PSLRA indicates that Congress heightened the pleading requirements for fraud because the securities fraud laws were being abused and "[u]nwarranted fraud claims can lead to serious injury to reputation for which our legal system effectively offers no redress." H.R. Conf. Rep. 104-369, at 41 (1995), 1995 U.S.C.C.A.N. 730, 740; *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007) (noting that the PSLRA was "[d]esigned to curb perceived abuses of the § 10(b) private action"). In ERISA cases such as this, however, plaintiffs are not accusing defendants of fraud. They are accusing defendants only of violating a fiduciary duty of prudence, which does not carry the same stigma.

Nor have we applied other, similar heightened pleading standards to ERISA claims. Only when plaintiffs invoke the fraud exception to ERISA's usual statutes of limitations, for instance, have we required them to follow the heightened pleading standards for fraud laid out in Federal Rule of Civil

29

Procedure 9(b). *See Janese v. Fay*, 692 F.3d 221, 228 (2d Cir. 2012); *see also Concha v. London*, 62 F.3d 1493, 1502 (9th Cir. 1995) (holding that Rule 9(b) does not apply to ERISA fiduciary-duty claims).

"ERISA and the securities laws ultimately have differing objectives pursued under entirely separate statutory schemes designed to protect different constituencies—ERISA plan beneficiaries in the first instance and purchasers and sellers of securities in the second." *In re Lehman Bros. Sec. & ERISA Litig.*, 113 F. Supp. 3d 745, 768 (S.D.N.Y. 2015), *aff'd sub nom. Rinehart*, 817 F.3d 56; *accord In re: BP Sec., Derivative & Emp't Ret. Income Sec. Act (ERISA) Litig.*, 734 F. Supp. 2d 1380, 1382 (J.P.M.L. 2010). Congress has chosen different structures to handle different claims; it is not our role to tie together what Congress has chosen to keep separate. If plaintiffs do begin to abuse ERISA in the way Congress felt they have abused the securities laws, then Congress can amend ERISA accordingly.

Just because the dismissal of the parallel securities suit is not preclusive, however, does not mean that it is irrelevant. Our recognition of a plausible ERISA duty-of-prudence claim assumes—consistent with the *Insulators* ruling— that the Plan defendants did *not* commit securities fraud but, nevertheless, that

Jander plausibly alleges that the Plan defendants had the requisite knowledge of overvaluation to raise fiduciary responsibilities consistent with the standard identified in *Fifth Third*. Since the *Insulators* suit was dismissed and not appealed, Jander may not allege directly or indirectly that the Plan defendants committed securities fraud. However, he may of course allege (and attempt to prove) that the Plan defendants knew about the microelectronics division's overvaluation and failed to disclose it.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment below and **REMAND** this matter to the district court for further proceedings consistent with this opinion.