**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-1885

_____

MICHAEL PERRONE; TOM TARANTINO; ROCHELLE
ROSEN, as participants in and on behalf of the Johnson &
Johnson Savings Plan, and on behalf of a class of all others
who are similarly situated,
                                                              Appellants

v.

JOHNSON & JOHNSON; PETER FASOLO; DOMINIC J.
CARUSO; JOHN DOES 1-20

_____

On Appeal from the United States District Court
For the District of New Jersey
(D.C. Nos. 3-19-cv-00923 and 3-19-cv-01115)
District Judge:  Honorable Freda L. Wolfson

_____

Argued
January 20, 2022

Before:  JORDAN, RESTREPO and SMITH, *Circuit Judges*

(Filed: September 7, 2022)

_____

Kyle G. Bates
James A. Bloom
Todd Schneider
Schneider Wallace Cottrell Konecky
2000 Powell Street – Suite 1400
Emeryville, CA   94608

Samuel E. Bonderoff   [ARGUED]
Jacob H. Zamansky
Zamansky
50 Broadway – 32nd Floor
New York, NY   10004

Todd S. Collins
Ellen T. Noteware
Berger Montague
1818 Market Street – Suite 3600
Philadelphia, PA   19103

Joseph J. DePalma
Lite DePalma Greenberg & Afanador
570 Broad Street – Suite 1201
Newark, NJ    07201
            *Counsel for Appellants*

Mark B. Blocker   [ARGUED]
Christopher Y. Lee
Abigail Molitor
Kristen R. Seeger
Sidley Austin
One South Dearborn Street
Chicago, IL   60603

Keith J. Miller
Robinson Miller
110 Edison Place
19th Floor, Suite 302
Newark, NJ   07102
        *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

Johnson & Johnson ("J&J") offers an Employee Stock Ownership Plan ("ESOP") as an investment option within its retirement savings plans. The ESOP invests solely in J&J stock, which declined in price following a news report accusing J&J of concealing that its popular baby powder was contaminated with asbestos. J&J denied both that its product was contaminated and that it had concealed anything about the product. What's important here, however, is the stock market ramifications of the allegation. The Plaintiffs, J&J employees who participated in the ESOP, allege that the ESOP's administrators, who are senior officers of J&J, violated their fiduciary duties by failing to protect the ESOP's beneficiaries

3

from a stock price drop. According to the Plaintiffs, those fiduciaries, being corporate insiders, should have seen the price drop coming because of the baby powder controversy. Specifically, the Plaintiffs allege that the corporate-insider fiduciaries violated the duty of prudence imposed on them by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1002-1003.

In *Fifth Third Bancorp v. Dudenhoeffer*, the Supreme Court held that a plaintiff seeking to bring such a claim must plausibly allege "an alternative action that the defendant could have taken that would have been consistent with the securities laws," and, further, "that a prudent fiduciary in the same circumstances would not have viewed [the proposed alternative action] as more likely to harm the fund than to help it." 573 U.S. 409, 428 (2014). The Plaintiffs here propose two alternative actions that they say the Defendants should have taken before the stock price dropped. First, they say that the Defendants could have used their corporate powers to make public disclosures that would have corrected J&J's artificially high stock price earlier rather than later. Second, they say that the fiduciaries could have stopped investing in J&J stock and simply held onto all ESOP contributions as cash.

The District Court rejected those alternative actions as failing the *Dudenhoeffer* test, and we agree. A reasonable fiduciary in the Defendants' circumstances could readily view corrective disclosures or cash holdings as being likely to do more harm than good to the ESOP, particularly given the uncertainty about J&J's future liabilities and the future movement of its stock price. We will therefore affirm the dismissal of the Plaintiffs' complaint.

4

# I. BACKGROUND[1]

## A. Baby Powder, Talc, and Asbestos

J&J sells hundreds of products in a variety of categories, but perhaps none is better known than Johnson's Baby Powder. Since 1894, J&J has sold and marketed its baby powder for many uses. The main ingredient in the baby powder is talc, an underground mineral that is extracted by mining. The problem with mining talc, however, is that talc deposits can be located dangerously close to a different and notorious mineral: asbestos. Asbestos is a carcinogen linked to ovarian cancer and mesothelioma, among other serious ailments. Some governmental and non-governmental organizations have suggested that talc may be contaminated with asbestos and have warned of a link between talc usage and ovarian cancer.

The Plaintiffs assert that, for decades, J&J has known that Johnson's Baby Powder might contain asbestos. According to the Plaintiffs, J&J has repeatedly suppressed unfavorable research about asbestos in talc, disregarded internal company concerns about asbestos in its baby powder,

---

[1] The following background section is taken from the allegations in the Plaintiffs' amended class action complaint. When reviewing a district court's decision on a motion to dismiss, we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the non-moving party. *Geness v. Admin. Off. of Pa. Cts.*, 974 F.3d 263, 269 (3d Cir. 2020).

and undermined efforts to regulate asbestos in talc products generally.

Over the years, thousands of plaintiffs have filed products liability lawsuits alleging that J&J's talc products caused cancer. Those plaintiffs have had mixed success. J&J has always denied liability and publicly affirmed that its products are asbestos-free and safe for everyday use. In its Form 10-Ks for fiscal years 2012 through 2016, it professed its "commit[ment] to investing in research and development with the aim of delivering high quality and innovative products," and it asserted that it had "substantial defenses" to talc-related products liability claims. (App. at 65-77.) In December 2016, J&J proclaimed on its website that it continued to use talc in its baby powder "because decades of science have reaffirmed its safety." (App. at 74.) In late 2017, J&J spokespeople told the press that its talc products "are, and always have been, free of asbestos, based on decades of monitoring, testing[,] and regulation," and that Johnson's Baby Powder "does not contain asbestos or cause mesothelioma or ovarian cancer[.]" (App. at 77.) As recently as January 2019, J&J touted its talc as being "carefully selected, processed[,] and tested to ensure that [it] is asbestos free, as confirmed by regular testing conducted since the 1970s." (App. at 78.)

Market pressure on J&J increased on December 14, 2018, when Reuters published an investigative report titled *J&J Knew For Decades That Asbestos Lurked In Its Baby Powder*. The article asserted that J&J knew but concealed that the talc in its baby powder likely contained asbestos. It also accused J&J of attempting to influence government regulation and scientific research on the issue. The article was picked up by other news sources and received wide distribution. J&J's

6

stock price "declined more than 10% following the Reuters report[.]"  (App. at 52.)[2]

### B. The Products Liability Action and the Securities Fraud Action

The accusations about J&J's baby powder led to two significant lawsuits that, like this one, are pending in the U.S. District Court for the District of New Jersey.  The first, which we will call the "Products Liability Action," is actually fifty-four different actions centralized from at least twenty-three district courts under the federal rules permitting multi-district litigation.  28 U.S.C. § 1407; *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Liab. Litig.*, 220 F. Supp. 3d 1356, 1357 (J.P.M.L. 2016).  All of those cases involve claims that asbestos in J&J's talc products caused personal injuries.  *Id.*  The MDL proceeded to discovery after J&J filed an answer to the amended master complaint in April 2017.

The second case, the "Securities Fraud Action," is a putative class action alleging that J&J and its senior executive officers violated federal securities disclosure laws, based on many of the same facts described above.  *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *1-8 (D.N.J. Dec. 27, 2019).  J&J moved to dismiss it, but the District Court denied that motion in part in December 2019.  *Id.* at *30.

---

[2] The complaint does not provide any timeframe to give clarity to that assertion.

## C.   The ERISA Plans

Also in 2019, the Plaintiffs here filed their proposed class action.[3]   Rather than bring a products liability or securities fraud claim, they assert that the Defendants are liable for a third type of legal violation: a breach of fiduciary duties under ERISA.

J&J sponsors several defined contribution plans into which its employees can invest a portion of their salaries for retirement.[4]   Those defined contribution plans include the Johnson & Johnson Savings Plan (the "Savings Plan"), the Johnson & Johnson Savings Plan for Union Represented Employees, and the Johnson & Johnson Retirement Savings Plan (collectively, the "Plans").  The Plans are all governed by the provisions of ERISA.  29 U.S.C. §§ 1002-1003.  The Plans' fiduciaries – the individual Defendants here – constitute J&J's

---

[3] Plaintiff Michael Perrone filed a complaint on January 22, 2019.  Plaintiffs Tom Tarantino and Rochelle Rosen filed a complaint on January 25, 2019.  The two complaints asserted substantively identical claims, and they were consolidated on June 20, 2019.

[4] A defined contribution plan, as defined by ERISA, is "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account."  29 U.S.C. § 1002(34).

8

Pension and Benefits Committee, which has general authority over the management and administration of the Plans.

Each of the Plans includes an investment option allowing employees to place their contributions in an ESOP, which invests exclusively in J&J stock. The ESOP additionally includes a small cash buffer, which provides the cash necessary for daily liquidity. The Plaintiffs here were participants in the Savings Plan and invested in J&J stock through the ESOP.[5] In particular, they participated in the Savings Plan during the proposed Class Period, namely, between April 11, 2017 (when discovery commenced in the Products Liability Action) and December 14, 2018 (when the Reuters report allegedly drove down the J&J stock price).

### D. The District Court's Decisions

The Plaintiffs' consolidated class action complaint alleged that the members of the Pension and Benefits Committee breached their fiduciary duties by not acting prudently in the administration of the Plans. More specifically, according to the Plaintiffs, those fiduciaries knew or should have known that J&J was concealing the truth about its dangerous talc products and that J&J's stock price was therefore overvalued, yet they continued holding and purchasing J&J stock. The Plaintiffs asserted that the Defendants should have instead protected the ESOP

_____

[5] The Plaintiffs were participants in the Savings Plan, but they purport to bring this class action on behalf of participants in all Plans.

9

participants from the inevitable stock price decline by issuing corrective public disclosures.

The Defendants moved to dismiss, and the District Court granted their motion. Applying the *Dudenhoeffer* standard, the Court held that the Plaintiffs had not adequately pleaded a viable alternative action that the individual Defendants, as ERISA fiduciaries, could have taken, because they could only have issued corrective disclosures in their corporate capacities and not in their ERISA-fiduciary capacities. It also concluded that the Plaintiffs failed to allege particularized facts to support their argument that earlier disclosure of the potential asbestos liabilities would have been less harmful to the ESOP and its participants than the later disclosure that occurred. The Court accordingly dismissed the ERISA claims, but it did so without prejudice, allowing the Plaintiffs an opportunity to allege other actions that the individual Defendants could have taken.

In June 2020, the Plaintiffs filed an amended class action complaint that largely duplicated the prior one. They reiterated their theory that the ERISA fiduciaries should have issued corrective disclosures, but they added reasons for why the Defendants could have issued disclosures in their capacities as ERISA fiduciaries. The Plaintiffs also presented another alternative: they said that the fiduciaries should have protected the ESOP participants from the J&J stock price decline by directing new contributions to the ESOP's cash buffer instead of buying overvalued J&J stock.

The Defendants again moved to dismiss, and the District Court granted their motion. It was still unpersuaded by the Plaintiffs' corrective-disclosure theory, concluding, as

before, that the Defendants could only have issued corrective disclosures in their corporate capacities. It also rejected both the corrective-disclosure theory and the cash-buffer theory on the ground that it was not clear either alternative action would have avoided doing more harm than good to the ESOP. The Plaintiffs have timely appealed.

## II.    DISCUSSION[6]

ERISA requires fiduciaries to "discharge [their] duties with respect to a plan … with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Congress has encouraged ESOPs as a means for employees to invest in the employer's securities. 29 U.S.C. § 1107(d)(6); *Dudenhoeffer*, 573 U.S. at 416. Due to the unique purpose and composition of ESOPs, ERISA exempts ESOPs from some obligations that are part of the general duty of prudence. For example, plan fiduciaries need not diversify assets in an ESOP. 29 U.S.C. § 1104(a)(2). Based on those exemptions, we and other circuit courts had at one time concluded that the fiduciaries of an ESOP should be afforded a presumption of prudence. *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995).

---

[6] The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

11

In *Dudenhoeffer*, however, the Supreme Court definitively rejected that presumption. 573 U.S. at 415-25. It acknowledged the need for balance between "ensuring fair and prompt enforcement of rights under a plan" and "encourag[ing] … the creation of [ESOPs]." *Id.* at 424 (quotation omitted). But it concluded that the presumption applied by the courts of appeals was "[not] an appropriate way to weed out meritless lawsuits or to provide the requisite 'balancing[,]'" because it made it "impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious, unless the employer is in very bad economic circumstances." *Id.* at 425. Instead, it held that the better way to "divide the plausible sheep from the meritless goats" was through "careful, context-sensitive scrutiny of a complaint's allegations." *Id.*

The *Dudenhoeffer* Court provided some detail about how that is to be done. *Id.* at 425-30. It called Rule 12(b)(6) an "important mechanism for weeding out meritless claims" and again emphasized that "the appropriate inquiry will necessarily be context specific." *Id.* at 425. Addressing allegations that the ESOP fiduciaries "behaved imprudently by failing to act on the basis of nonpublic information that was available to them because they were [corporate] insiders[,]" the Court prescribed new pleading requirements to be applied in that context:

> To state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same

12

circumstances would not have viewed as more likely to harm the fund than to help it.

*Id.* at 427-28 (emphasis omitted).

The *Dudenhoeffer* Court then presented a few "additional considerations[.]" *Id.* at 428-30. When a complaint alleges that the fiduciaries should have used their inside information to refrain from making additional stock purchases, the court should consider whether that action would conflict with the requirements and objectives of insider trading laws. *Id.* at 429. Similarly, when the complaint alleges that the fiduciaries should have publicly disclosed the inside information, the court should consider whether that action would conflict with the substance and objectives of corporate disclosure requirements imposed by the federal securities laws. *Id*. Finally, in the case of disclosure as an alleged alternative action, the court should also consider whether a prudent fiduciary could have concluded that disclosing the negative information – either expressly by public disclosure or implicitly by stopping purchases – "would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." *Id.* at 429-30. The Supreme Court has twice reaffirmed *Dudenhoeffer*'s guidance. *Amgen Inc. v. Harris*, 577 U.S. 308, 310-11 (2016) (per curiam); *Ret. Plans Comm. of IBM v. Jander*, 140 S. Ct. 592, 594-95 (2020) (per curiam).

The Plaintiffs here allege two alternative actions that, according to them, meet the *Dudenhoeffer* standard. The first is that the Defendants could have corrected the price inflation by "caus[ing] truthful or corrective disclosures to be made much earlier to cure the Company's misrepresentations and

13

material omissions[.]" (App. at 83.) According to the Plaintiffs, "the disclosure would be that [J&J has] known about [its] talc product having asbestos in it for quite some time [and that it is] aware of scientific studies that asbestos has been linked to cancer[.]" (Oral Arg. at 2:53-3:09.) The Plaintiffs also would have had the Defendants admit on J&J's behalf that its companies' talc products were not "completely, 100 percent safe." (Oral Arg. at 3:18-3:22.) The second alternative the Plaintiffs propose is that the "Defendants could have … direct[ed] new ESOP investments … to be used to increase the ESOP's cash buffer rather than to buy inflated Johnson & Johnson stock." (App. at 92.) As discussed below, however, neither suggested alternative action satisfies *Dudenhoeffer*, because a prudent fiduciary in the Defendants' position could have concluded that either action would harm more than help the ESOP.[7]

---

[7] The Plaintiffs argue that it is "frankly[] baffling" that some of the claims in the Securities Fraud Action can survive a motion to dismiss while an ERISA claim based on the same facts cannot. (Opening Br. at 39-40.) But there is nothing incongruous about a set of facts satisfying one pleading standard (e.g., under the Private Securities Litigation Reform Act) but not another (e.g., under *Dudenhoeffer*). *See Saumer v. Cliffs Nat. Res., Inc.*, 853 F.3d 855, 865 n.2 (6th Cir. 2017) ("[A]lleged securities law violations do not necessarily trigger a valid ERISA claim." (quoting *Jander v. Int'l Bus. Mach. Corp.*, 205 F. Supp. 3d 538, 546 (S.D.N.Y. 2016))). Indeed, we commend Chief Judge Freda L. Wolfson – who is presiding over the Products Liability Action, the Securities Fraud Action, and this ERISA case – for her skillful management of all three.

## A. Corrective Disclosures

The Plaintiffs first propose that the Defendants should have taken the alternative action of making public disclosures to correct the stock's artificial inflation. We will assume without deciding that the corrective disclosures the Plaintiffs suggest are ones that would satisfy *Dudenhoeffer*'s first prong – i.e., that they would constitute a viable alternative action that Defendants "could have taken that would have been consistent with the securities laws[.]" *Dudenhoeffer*, 573 U.S. at 428. Nevertheless, we agree with the District Court that the Plaintiffs' proposed alternative action still fails at *Dudenhoeffer*'s second prong.[8]

A plaintiff must plausibly allege that "a prudent fiduciary in the same position 'could not have concluded' that the alternative action 'would do more harm than good.'" *Amgen*, 577 U.S. at 311 (quoting *Dudenhoeffer*, 573 U.S. at 411). As the Fifth Circuit has summarized, that standard places on the plaintiff "the significant burden of proposing an alternative course of action so clearly beneficial that a prudent fiduciary *could not conclude* that it would be more likely to harm the fund than to help it." *Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016). That is a high bar to clear, even at the pleadings stage, especially when guesswork is involved, as it is when estimating the effect of earlier versus later public disclosure of information which is itself fluid.

---

[8] We therefore need not address the Defendants' additional argument that they cannot be held liable in their ERISA-fiduciary capacities for an action that they could only have taken in their corporate-insider capacities.

15

Under *Dudenhoeffer*, the plaintiff must do more than allege a general economic theory for why earlier disclosure would have been preferable. *Dormani v. Target Corp.*, 970 F.3d 910, 915 (8th Cir. 2020) ("[A]llegations based on general economic principles are too generic to meet the requisite pleading standard." (cleaned up)); *Wilson v. Craver*, 994 F.3d 1085, 1093 (9th Cir. 2021) ("[I]f all that is required to plead a duty-of-prudence claim is recitation of generic economic principles that apply in every ERISA action, every claim, regardless of merit, would go forward."). Instead, "where general economic principles are alleged, the complaint must also include context-specific allegations explaining why an earlier disclosure was so clearly beneficial[.]" *Wilson*, 994 F.3d at 1093. "Because the content of the duty of prudence turns on the circumstances prevailing at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022) (cleaned up).

Furthermore, the plaintiff must plausibly allege that the circumstances do not justify a prudent fiduciary's preference to await the results of a thorough investigation into the matter before making public disclosure. *See, e.g.*, *Wilson*, 994 F.3d at 1095 (allegations insufficient because they did not allege that a "prudent fiduciary could not have concluded that deferring a disclosure until after the completion of investigations into the nature of the alleged fraud … would cause more harm than good"); *Allen v. Wells Fargo & Co.*, 967 F.3d 767, 774-75 (8th Cir. 2020) ("[A] prudent fiduciary – even one who knows disclosure is inevitable and that earlier disclosure may ameliorate some harm to the company's stock price and reputation – could readily conclude that it would do more harm

16

than good to disclose information about Wells Fargo's sales practices prior to the completion of the government's investigation."), *cert. denied*, 141 S. Ct. 2594 (2021); *Martone v. Robb*, 902 F.3d 519, 527 (5th Cir. 2018) ("[A]n unusually-timed disclosure [of fraud] risks 'spooking the market,' creating the potential for an outsized stock drop."). Where it is "uncertain" whether earlier disclosure would be superior to potential later disclosure, a reasonably prudent fiduciary could still believe that early disclosure is "the more dangerous of the two routes." *Dormani*, 970 F.3d at 915.

Only one post-*Dudenhoeffer* decision from our sister circuits has held that a plaintiff plausibly alleged that corrective disclosures were so clearly beneficial that no prudent corporate-insider fiduciary could have concluded that earlier corrective disclosures would have done more harm than good.[9] In *Jander v. Retirement Plans Committee of IBM*, 910 F.3d 620, 623 (2d Cir. 2018), IBM had sought to sell its microelectronics business, which was having financial trouble

---

[9] Numerous other courts have concluded that "a prudent fiduciary could readily conclude that disclosure would do more harm than good 'by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund.'" *Allen v. Wells Fargo & Co.*, 967 F.3d 767, 773 (8th Cir. 2020); *see also Wilson v. Craver*, 994 F.3d 1085, 1095 (9th Cir. 2021); *Dormani v. Target Corp.*, 970 F.3d 910, 915 (8th Cir. 2020); *Singh v. RadioShack Corp.*, 882 F.3d 137, 149 (5th Cir. 2018); *Martone v. Robb*, 902 F.3d 519, 525-27 (5th Cir. 2018); *Saumer*, 853 F.3d at 864; *Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016); *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016).

and was on track to incur annual losses of $700 million. Nevertheless, IBM did not disclose those problems and instead publicly valued the business at $2 billion. *Id.* at 623. Once it found a buyer, however, IBM finally disclosed that it would pay $1.5 billion to have the buyer take the business off its hands and that it would also incur "a $4.7 billion pre-tax charge, reflecting in part an impairment in the stated value" of the business being sold. *Id.* IBM's stock price steeply declined, and participants in its ESOP brought a lawsuit alleging that the plan's corporate-insider fiduciaries knew about the undisclosed problems with the microelectronics business but imprudently continued to invest in shares of IBM stock, the price of which reflected the market's lack of knowledge of microelectronics' troubles. *Id.* The plaintiffs alleged that the corporate-insider fiduciaries should have made an early corrective disclosure. *Id.* at 628.

The Second Circuit held that the plaintiffs had met *Dudenhoeffer*'s standard for a duty-of-prudence claim based on inside information. *Id.* In the court's view, it was "particularly important" that the defendants allegedly knew that disclosure of the financial problems was inevitable. *Id.* at 630. Unlike in the "normal case," where a prudent fiduciary might compare the benefits of disclosure versus non-disclosure, a prudent fiduciary in the *Jander* defendants' circumstances could only compare earlier disclosure versus later disclosure, because once IBM knew its sale of its microelectronics business was inevitable, "non-disclosure of IBM's troubles was no longer a realistic option[.]" *Id.* at 630-31. Thus, the court concluded that "a stock-drop following early disclosure would be no more harmful than the inevitable stock drop that would occur following a later disclosure." *Id.* at 631.

18

The Plaintiffs ask that we follow *Jander*, but their complaint relies too much on general economic theory and too little on specific allegations that would establish that no prudent fiduciary in the Defendants' circumstances would believe that making corrective disclosures would do more harm than good. They allege that "[if the] Defendants had caused corrective public disclosure near the very beginning of J&J's misrepresentations and material omissions … almost all of the artificial inflation of J&J's stock price that occurred could have been avoided, and virtually no Plan participants who purchased inflated shares of the Fund would have been harmed. But as the concealment went on, more and more Plan participants made purchases at artificially high prices, [and] the harm to Plan participants steadily increased." (App. at 84.) They also allege that the Defendants' failure to make corrective disclosures "ma[de] the eventual collapse worse" and that their "prolonged misrepresentation" caused increasingly greater "reputational damage" to J&J. (App. at 84-85.) While couched in "context specific" terms of the J&J ESOP, *Dudenhoeffer*, 573 U.S. at 425, all of that is in actuality just a recitation of general economic theory and cannot by itself support a duty-of-prudence claim consistent with the *Dudenhoeffer* standard. *Dormani*, 970 F.3d at 915.

Perhaps recognizing the insufficiency of their generalized allegations, the Plaintiffs argue that they have also made specific factual allegations "to support the contention that the disclosure of the dangers posed by [J&J's] talc products was inevitable," just like in *Jander*. (Opening Br. at 36.) Their theory of inevitability is as follows: "[A]s the lawsuits against J&J over illness caused by its talc products proliferated, and the possibility of those lawsuits surviving

19

motions to dismiss and reaching discovery increased, [it became] more and more likely that fact discovery in one or more of those cases would lead to the disclosure of J&J's internal memos about its longstanding knowledge of asbestos in its talc." (Opening Br. at 36.)

But that theory has a fatal shortcoming. Even if disclosure of some unfavorable documents was likely once discovery commenced in products liability litigation, it is to this day uncertain whether J&J should be liable in tort for dangers relating to its talc products. The products liability actions are, after all, ongoing. It would make no sense for us to resolve the question of tort liability, still undetermined in that case, in this collateral ERISA litigation.

Nor has J&J admitted that its talc products contain asbestos. By contrast, in the events leading up to *Jander*, IBM allegedly did take steps suggesting that the prior public valuations of its microelectronics businesses were overinflated, although it took those steps somewhat later than the allegedly prudent time to disclose. 910 F.3d at 623, 630. Here, because J&J has not and likely will not make the disclosure proposed by the Plaintiffs, it can hardly be said that all prudent fiduciaries would have concluded in 2017 that such disclosure was "inevitable." *Id.* at 630. And while the Plaintiffs say that "internal documents showing the perpetration of [a] massive coverup and misrepresentation" (App. at 86) were sure to come out, J&J has already prevailed in some products liability trials, demonstrating that there is no consensus that J&J ever had any talc-related issues to cover up. Furthermore, early disclosures to the press, necessarily shorn of context, could cause the stock market to overreact, misunderstanding the legal significance of the information and believing that J&J would be subject to

20

more legal liability than it really would be.  Thus, a reasonably prudent fiduciary in the Defendants' circumstances could conclude that corrective disclosures would do more harm than good to the ESOP.

## B.   Redirection of Contributions to the Cash Buffer

The Plaintiffs also assert that, instead of using new ESOP contributions to purchase J&J stock at artificially inflated prices, the Defendants should have taken the alternative action of redirecting contributions into the ESOP's cash buffer.  A cash buffer is a common component of an ERISA retirement savings plan.  *E.g.*, *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 793 (7th Cir. 2011).  It "allows participants to quickly sell their interests in the funds" without having to wait for the sale of stock to obtain cash and "allows the [p]lan to save transaction costs by 'netting' participant transactions" – that is, matching one participant's sale with another's purchase – avoiding brokerage commissions being charged to the plan each time a request to buy or sell stock is made. *Id.*  The Plaintiffs suggest that a prudent fiduciary would additionally use the cash buffer as a hedging instrument.  But that is not a fair conclusion.

The option of redirecting funds to an ESOP's cash buffer "leaves a fiduciary 'between a rock and a hard place' and likely to be sued for imprudence either way if he guesses wrong about where the stock is headed." *Dormani*, 970 F.3d at 915 n.4 (quoting *Dudenhoeffer*, 573 U.S. at 424).  If fiduciaries increase the cash buffer and then the stock price rises, plan participants might assert a duty-of-prudence claim against them for allowing the cash buffer to generate

"investment drag." *George*, 641 F.3d at 793. On the other hand, under the Plaintiffs' theory, if the fiduciaries hold the cash buffer steady or reduce it and then the stock price drops, plan participants might assert a duty-of-prudence claim for not increasing the cash buffer to mitigate losses.

While there may be circumstances in which a reasonably prudent fiduciary would find it advantageous to increase the cash buffer rather than buy the company's stock, the Plaintiffs have not adequately pleaded that those circumstances exist here. As discussed already, it was a guess that J&J's stock price would drop significantly, and there was even less certainty about the timing and degree of such a drop. A prudent fiduciary in the Defendants' position reasonably could have anticipated that J&J's stock price was not bound to tumble, or could have believed that any price drop would be outweighed by gains accrued prior to the drop or by a rapid rebound. It is simply too much of a stretch to say that a prudent fiduciary in the Defendants' position "could not have concluded" that redirecting contributions to the ESOP's cash buffer "would do more harm than good." *Amgen*, 577 U.S. at 311.[10]

## III.   CONCLUSION

For the foregoing reasons, the Plaintiffs have failed to meet the high standard for pleading a claim under ERISA for

---

[10] We need not address the Defendants' arguments that redirecting ESOP contributions to the cash buffer would have required, or otherwise resulted in, public disclosure.

22

breach of the duty of prudence based on inside information.[11] We will therefore affirm.

---

[11] Nothing in this opinion should be construed as providing any comment on the merits of the Products Liability Action or the Securities Fraud Action.